RONALD STRINGER AND ANDREA S. BOUCHER STRINGER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 26045–82, 3389–83.    Filed April 15, 1985.

*Arthur P. Tranakos*, for the petitioners.
*Daniel J. Wiles*, for the respondent.

STERRETT, *Judge*: In these consolidated cases, respondent determined by separate notices of deficiency issued to each of petitioners and dated August 2, 1982, that petitioners Ronald Stringer and Andrea Stringer were liable for deficiencies in tax and additions to tax under sections 6651(a) and 6653(a), I.R.C. 1954, for the years 1978 and 1979 in docket No. 26045–82 in the following amounts:

| Petitioner | Year | Deficiency | Addition to tax | |
| --- | --- | --- | --- | --- |
| | | | Sec. 6651(a) | Sec. 6653(a) |
| Ronald Stringer | 1978 | $5,201 | $387 | $260 |
| | 1979 | 6,410 | 427 | 321 |
| Andrea Stringer | 1978 | 271 | - - - | 14 |
| | 1979 | 4,328 | 375 | 216 |

By separate notices of deficiency issued to each of petitioners and dated November 17, 1982, respondent further determined that petitioners Ronald Stringer and Andrea Stringer were liable for deficiencies in tax and additions to tax under sections 6653(b) and 6654 for the years 1980 and 1981 in docket No. 3389–83 in the following amounts:

| Petitioner | Year | Deficiency | Addition to tax | |
| | | | Sec. 6653(b) | Sec. 6654 |
| --- | --- | --- | --- | --- |
| Ronald Stringer | 1980 | $8,075.00 | $4,037.50 | $515.56 |
| | 1981 | 14,822.00 | 7,411.00 | 1,135.73 |
| Andrea Stringer | 1980 | 4,775.08 | 2,387.54 | 381.08 |
| | 1981 | 10,236.00 | 5,118.00 | 980.40 |

After certain concessions by the parties, the remaining issues for decision are (1) whether we should enter a judgment of default or dismissal against petitioners pursuant to Rule 123(a) or Rule 123(b), Tax Court Rules of Practice and Procedure,[1] with respect to issues upon which they bear the burden of proof, and (2) whether respondent has carried his burden of proof with respect to issues upon which he bears the burden of proof.

FINDINGS OF FACT

Some of the facts have been stipulated and those facts are so found to the extent that they represent concessions by the parties of items of income, deductions, or credits. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference to the same extent. In addition, the Court has made its own findings of fact, but those findings are limited to facts that the Court deems necessary to dispose of respondent's Motion for Entry of Default Judgment or Dismissal pursuant to Rule 123 with respect to issues upon which petitioners bear the burden of proof and to dispose of the issues upon which respondent bears the burden of proof.

At the time they filed their petitions in this case, petitioners, who are husband and wife, resided at 872 Doris Drive in Arnold, Maryland. During the years at issue, Andrea Stringer (hereinafter Andrea) was an assistant professor at Towson State University, and Ronald Stringer (hereinafter Ronald) was an engineer for Bethlehem Steel Shipyards. Andrea had obtained a Ph.D. degree in physical education at the University of Maryland. Ronald had a high school diploma and had further training in shipbuilding and the preparation of publications relating thereto. He also apparently had some college education.

---

[1] Unless otherwise stated, all Rule references are to the Tax Court Rules of Practice and Procedure.

For the years from at least 1974 through 1977, petitioners filed joint Federal income tax returns disclosing tax liabilities. Petitioners hired tax return preparers to prepare those returns.

For the year 1978, petitioners separately mailed to the Internal Revenue Service (IRS) altered Forms 1040 that contained no financial information with respect to petitioners' tax liabilities. The documents were filled out in a manner that fairly may be described as typical tax protester fashion. Information elicited on the forms was responded to by asterisks. An apparently preprinted statement at the bottom of the forms explained that the asterisks denoted constitutional objections to providing the information elicited. Petitioners had a tax liability payable to the IRS for the year 1978. Their assertions of constitutional objections were frivolous, insincere, and motivated by their contempt for the American system of Federal income taxation. By letters dated June 25, 1979, and July 5, 1979, the IRS advised petitioners that the altered Forms 1040 were not acceptable as income tax returns and requested petitioners to file proper returns. Petitioners initially failed to file income tax returns as requested by respondent, preferring instead to continue asserting frivolous constitutional objections. Eventually, on December 30, 1981, petitioners did file a joint return for 1978. However, that return did not represent an honest attempt to establish correctly their 1978 tax liability, and petitioners were no longer relying on that return by the time their case came to trial.

Although petitioners had tax liabilities payable to the IRS with respect to their 1979, 1980, and 1981 taxable years, petitioners filed no Federal income tax returns for those years prior to the issuance of the statutory notices of deficiency. On May 16, 1984, one day before trial commenced in this case, petitioners filed joint Federal income tax returns for the years 1978 through 1981. The return for 1978 bore little, if any, resemblance to the 1978 return filed in December 1981. None of the returns filed on May 16, 1984, represented honest attempts to establish correctly petitioners' tax liabilities for the years in question. Attached to at least two of those returns were altered Forms W-2 prepared by petitioners' counsel, which varied from the original Forms W-2 received by peti-

tioners. Nothing on the face of the Forms W-2 prepared by petitioners' counsel and attached to the returns suggested that they had been prepared by other than the actual payer of the wages.

Beginning in early 1980 and continuing at least through 1982, Ronald executed and filed with his employer, IRS Forms W-4 falsely claiming on each form that he had incurred no Federal income tax liability for the previous year and anticipated incurring no such liability for the current year. For the periods covered by the exemption certificates, Ronald had Federal income tax liabilities and knew that he had such liabilities. As a result of the false exemption certificates, Ronald's employer did not withhold any Federal income taxes from Ronald's salary for the years 1980 and 1981.

Andrea likewise executed and filed IRS Forms W-4E, falsely claiming to be exempt from Federal income tax withholding. As a result of the false exemption certificates, Andrea's employer did not withhold Federal income taxes from Andrea's salary in 1980 and 1981.

Respondent's agents made diligent attempts to contact and communicate with petitioners in an effort to ascertain petitioners' correct tax liabilities for the years in issue. However, petitioners remained uncooperative throughout the audit phases of this case and engaged in tactics designed to delay and obstruct respondent's determination of their tax liabilities. Respondent was left with no choice but to reconstruct petitioners' income based on whatever records he could locate.

It became apparent after their cases were docketed in this Court, that petitioners planned to assert various and sundry deductions and credits. However, it was equally apparent that the deductions and credits petitioners intended to claim were ill-defined, as witnessed by petitioners' ever-changing, inconsistent, and largely unsupported contentions. In an effort to flesh out petitioners' positions, respondent sought discovery through requests for admissions, interrogatories, and requests for production of documents. Petitioners initially disregarded respondent's attempts at discovery, forcing respondent to pursue court action to compel discovery. Petitioners never responded to respondent's first request for admissions, and the facts recited in that request were incorporated into the parties' stipulation of facts. By order dated July 12, 1983, this Court

ordered petitioners to produce the documents requested in respondent's request for production of documents and to answer the interrogatories served on petitioners. Petitioners did not fairly comply with the Court's order, whereupon respondent filed a motion to impose sanctions. At the initial hearing on that motion, the Court made it clear to petitioners' attorney that the Court was dissatisfied with petitioners' conduct and that it viewed as inexcusable their counsel's purported attempts to comply with the Court's order by turning over to respondent illegible copies of documents. The Court thereafter issued an order dated January 3, 1984, that petitioners serve full and complete answers to respondent's interrogatories and produce all of the documents requested in respondent's documents request. In addition, the Court continued the hearing on respondent's motion to impose sanctions.

Following the Court's order of January 3, 1984, petitioners filed supplemental answers to respondent's interrogatories. The answers were verified as true and correct by both petitioners. In response to questions eliciting information relating to any type of income received by petitioners during the years in question, petitioners relied on information contained in unsigned Forms 1040 for the years in question, which petitioners delivered to respondent. The unsigned Forms 1040 were prepared by an agent of petitioners through the use of certain documents turned over to him by petitioners. The documents used to prepare the Forms 1040 have since been destroyed.

On March 28, 1984, the Court held a hearing on respondent's prior motion to impose sanctions. At that hearing, respondent voiced his objections with respect to the adequacy of petitioners' supplemental answers to respondent's interrogatories. The hearing resulted in an order, dated March 30, 1984, which generally precluded petitioners from contradicting or supplementing their answers to interrogatories. The order further precluded petitioners from introducing into evidence or testifying to any documents not produced to respondent by February 7, 1984.

At the beginning of the trial in this case, the Court, in the interest of giving petitioners every opportunity to present their case, modified the March 30, 1984, order but only to the extent that it precluded petitioners from introducing into

evidence additional documents. That is, the order was not modified to the extent that it precluded petitioners from contradicting or supplementing their answers to interrogatories. As a result of the modification of the order, petitioners literally dumped scores of documents and lists into evidence in a professed effort to establish their entitlement to various deductions and credits. It was abundantly evident to the Court by the end of trial that the record, insofar as it related to the claimed deductions and credits, was hopelessly confused. Accordingly, in ordering opening briefs to be filed on September 17, 1984, and reply briefs to be filed on November 1, 1984, the Court directed petitioners' counsel as follows:

> Mr. Tranakos, you bear a heavy burden in terms of making detailed findings of fact to make your case because the Court is not going to audit all the pieces of paper. It must be directed to specific, detailed, easily found, legible evidence in support of any allegations or proposed findings of fact.

Pursuant to leave granted by the Court prior to the adjournment of the trial, respondent amended his pleadings to conform with the proof presented at trial. In the amended pleadings, respondent increased the determined deficiencies for all of the years in question and asserted an addition to tax for fraud for the years 1978 and 1979. The determined deficiencies and additions to tax set forth in the amended pleadings are in the following amounts:

| Petitioner | Year | Deficiency | Addition to tax | | Alternative addition to tax | |
|---|---|---|---|---|---|---|
| | | | Sec. 6653(b) | Sec. 6654 | Sec. 6653(a) | Sec. 6651(a). |
| Ronald and Andrea Stringer[2] | 1978 | $5,795 | $2,898 | - - - | $290 | $407 |
| Ronald Stringer | 1979 | 8,877 | 4,439 | - - - | 444 | 1,044 |
| Andrea Stringer | 1979 | 6,881 | 3,441 | - - - | 344 | 1,013 |
| Ronald Stringer | 1980 | 10,668 | 5,334 | $681 | - - - | - - - |
| Andrea Stringer | 1980 | 7,168 | 3,584 | 457 | - - - | - - - |
| Ronald Stringer | 1981 | 14,902 | 7,451 | 1,142 | - - - | - - - |
| Andrea Stringer | 1981 | 10,476 | 5,238 | 802 | - - - | - - -[3] |

[2]Respondent recognizes in his amended answer that petitioners are entitled to the use of joint rates with respect to their 1978 tax liability since they filed a 1978 return on Dec. 30, 1981, prior to the issuance of the notices of deficiency.

[3]We note that at no time did petitioners object to the granting of respondent's motion to amend the pleadings. Nor have they ever commented on the assertions contained in the amended answer. The facts in this case are clearly distinguishable from those in *Gilman v. Commissioner*, 18 B.T.A. 1277 (1930), aff'd. on another issue 53 F.2d 47 (8th Cir. 1931).

The only amounts of income included for the first time in respondent's amended answer that theretofore had not been stipulated or otherwise agreed to and, therefore, remained in dispute at the end of trial were the amount of consulting income received by Andrea in 1978, the amount of interest income received by both Andrea and Ronald in 1979, and the amount of rental income received by both Andrea and Ronald during 1978 through 1981. The parties have stipulated that petitioners owned rental properties jointly, and evenly divided the gross receipts received therefrom.[4]

Respondent's original statutory notices of deficiency with respect to 1978 did not take into account any consulting or rental income received by the parties. Respondent determined and so asserted in his amended answer that petitioners should have included in their income $1,510 in consulting income and $4,000 in rental income.

Respondent's determination with respect to the amount of consulting income received in 1978 was based on Andrea's testimony at trial and on notations of consulting assignments recorded in a diary kept by Andrea during 1978. Although her testimony was vague and evasive, Andrea indicated that she typically was paid $100 if she performed a full day's consulting work and $50 if she performed a half day's consulting work. Respondent generally multiplied these amounts or lesser amounts by the number of consulting trips that he determined were recorded in Andrea's diary.[5] Respondent became aware of the existence of the diary when Andrea referred to it in a claim for expense deductions. Despite respondent's formal request for all documents evidencing or concerning the receipt of income during the year 1978, the Court order of July 12, 1983, ordering petitioners to produce the requested documents, and a subpoena duces tecum ordering Andrea to produce all diaries maintained by her during 1978–81, Andrea failed to turn the 1978 diary over to respondent until the Court

---

[4]Evidently Andrea agrees with respondent's determinations that she received $747 of consulting income in 1979, $200 of consulting income in 1980, and $359 of consulting income in 1981. Respondent took these figures from the unsigned Forms 1040 referred to in the verified interrogatories. The returns filed on the day before trial in this case reflect this much or more consulting income in each of these years. In addition, petitioners admit, by stipulation, the correctness of respondent's determinations with respect to the receipt of a taxable State income tax refund in 1978 and the receipt of interest income in 1978 and 1981.

[5]In some cases, respondent determined that Andrea actually made notations of fees received, and he used the amounts noted in his calculations.

specifically directed her to do so at trial. Andrea admitted at trial that the 1978 diary was the only remaining evidence of the consulting income received in 1978.

During 1978, petitioners received rental income from property known as the Dunkirk Road property. Petitioners resided at that property until March 2, 1978, and then converted it into rental property. A notation of March 6, 1978, in Andrea's diary states "C & P at Dunkirk disconnect/connect." On their 1978 return filed December 30, 1981, petitioners reported $2,860 of gross income from that property. They later contended that they actually received $2,080 of gross income from the property. Both Ronald and Andrea testified in a characteristically vague manner that they thought they charged $260 rental per month. However, a mortgage application sworn to and certified by petitioners under penalties of Federal law in July 1978 indicates a rental figure of $400. Furthermore, a subsequent lease agreement entered into the following year with new tenants of the Dunkirk Road property contained a typewritten monthly rental figure of $400. The typewritten figure was marked through and replaced by a $425 monthly rental figure. Respondent determined, and so asserted in his amended answer, that petitioners received 10 months of rental income at $400 per month in 1978 for a total of $4,000.

Respondent's original statutory notice of deficiency with respect to 1979 did not take into account any interest or rental income received by petitioners.

Petitioners have admitted, by stipulation, that during 1979 they received interest of at least $179.52. In the unsigned 1979 Form 1040 referred to in their verified answers to interrogatories, petitioners indicated that they received interest income of $195. In their 1979 return filed the day before trial in this case, petitioners indicated that they received $175 of interest income. Respondent determined and so asserted in his amended answer that petitioners received total interest income of $195 in 1979.

Petitioners do not dispute that they received rental income during 1979 from three separate properties, the Dunkirk Road property, the Regester Avenue property, and the Murdock Drive property.

The Dunkirk Road property was rented to a Mrs. Smith from January through June 1979. In July 1979, petitioners

signed a lease with new tenants of the Dunkirk Road property. The rental amount was fixed at $425 per month, payable on the first day of each month. The lease term with the new tenants began on August 1, 1979. The new tenants paid a security deposit of $450 at the time they signed the lease. Petitioners have alternatively calculated their 1979 rental income from the Dunkirk Road property to be $2,725 and $3,685, without any credible explanation for either calculation. Respondent determined that petitioners received $4,525 of rental income from the Dunkirk Road property in 1979.[6] In arriving at this figure, respondent used the same $400 monthly rental figure described above with respect to the year 1978 for the first 6 months of the year and the increased $425 monthly rental figure for the last 5 months of the year.

Petitioners rented the Regester Avenue property from March or April 1979 through the end of the year to a Mrs. Gunning. In the unsigned 1979 Form 1040 referred to in their verified answers to interrogatories, petitioners indicated that they received $5,100 of income in 1979 from the Regester Avenue property. At trial, they contended that they actually received only $3,600 of rental income from the property in 1979. Respondent determined that petitioners received $5,100 of rental income from the Regester Avenue property in 1979.

On August 15, 1979, petitioners entered into a written lease with respect to the Murdock Drive property for a period of 1 year from September 1, 1979, through August 1980. The monthly rental on the lease was $365 a month, the first month of which was paid in advance in August 1979. Respondent determined that petitioners received 4 months of rent from the Murdock Drive property in 1979 at $365 per month, for a total of $1,460.[7]

Respondent's original statutory notices of deficiency with respect to 1980 did not take into account any rental income received by petitioners. However, it is uncontroverted that petitioners received rental income during 1980 from three

---

[6] In his amended answer, respondent actually asserts that petitioners received a total of $4,050 rental income from the Dunkirk Road property in 1979; however, on brief he reduces that figure to $4,525.

[7] In his amended answer, respondent actually asserts that petitioners received a total of $1,825 rental income from the Murdock Drive property in 1979; however, on brief he reduces that figure to $1,460.

separate properties, the Dunkirk Road property, the Regester Avenue property, and the Murdock Drive property.

The tenants who were living at the Dunkirk Road property at the end of 1979 continued renting the property through September 1980. The rental during this period of time was $425 per month, payable on the first day of each month. When the tenants vacated, they owed petitioners $425 of rent for September and $25 of rent for August. The tenants forfeited their $450 security deposit to pay for their rental obligations. Taking the forfeiture into account, respondent determined that petitioners received 9 full months of rent from the Dunkirk Road property in 1980 at $425 per month, for a total of $3,825.

Mrs. Gunning continued to rent the Regester Avenue property during part of 1980. The property was then rented to a Mrs. Atlas, who resided there through the end of the year. In the unsigned 1980 Form 1040 referred to in their verified answers to interrogatories, petitioners indicated that they received $5,100 of income in 1980 from the Regester Avenue property. At trial, they contended that they actually received only $3,600 of rental income from the property in 1980. Respondent determined that petitioners received $5,100 of rental income from the Regester Avenue property in 1980.

The tenants who were residing at the Murdock Drive property at the end of 1979 continued renting the property through August 1980 for a monthly rental of $365 per month. Petitioners purportedly transferred the Murdock Drive property to a trust for the benefit of their children in May 1980. However, petitioners did not transfer the lease and continued to collect the rent and applied it to the mortgage on the property. Respondent determined that petitioners received 8 full months of rent from the Murdock Drive property in 1980 at $365 per month, for a total of $2,920.

In his original statutory notices of deficiency with respect to 1981, respondent asserted that petitioners received total rental income of $3,500 from the Regester Avenue property to be reported 50 percent by Ronald and 50 percent by Andrea. Mrs. Atlas continued to reside at the Regester Avenue property through June 1981. The property was thereafter rented to a Mr. and Mrs. Manning. The exact monthly rent paid by Mrs. Atlas is not known. Petitioners have admitted that the

Mannings paid rent of $500 per month from August 1, 1981, through the end of the year. Petitioners also have admitted that they received rental income of not less than $3,500 in 1981. In the unsigned 1981 Form 1040 referred to in their verified answers to interrogatories, petitioners indicated that they received $4,275 of rental income in 1981. Respondent determined and so asserted in his amended answer that petitioners actually received total rental income from the Regester Avenue property of $5,750 in 1981.

Petitioners filed no brief whatsoever in this case. On November 13, 1984, respondent filed a Motion for Entry of Default Judgment or Dismissal pursuant to Rule 123 with respect to all issues upon which petitioners bear the burden of proof.

On November 30, 1984, the Court issued an order that petitioners return respondent's Exhibit AP, the 1978 diary maintained by Andrea and relied upon by respondent in establishing the amount of consulting income received in 1978 and the starting date of one of the tenancies in question. At the completion of the trial, petitioners' counsel had withdrawn the diary from the record for the avowed purpose of collaborating with respondent in making copies of the relevant pages. The order specifically stated that, upon petitioners' failure to comply with its terms, the Court would be inclined to impose appropriate sanctions. By letter dated December 12, 1984, petitioners' counsel transmitted to the Court essentially illegible copies of certain pages of respondent's Exhibit AP. This letter offered no explanation for the failure to file a brief.

## OPINION

We think it appropriate to stress at the outset, lest our rather sketchy findings of fact fail to portray the situation with which we are faced, that the record in this case borders on being totally unintelligible. We have before us a 598-page transcript, literally scores of exhibits, altered 1978 Forms 1040 announcing frivolous constitutional objections, a delinquent 1978 return filed on December 30, 1981, unsigned Forms 1040 for the years 1978 through 1981, and a final set of Forms 1040 for the years 1978 through 1981 filed 1 day before trial of this case. We place the blame for the confusion squarely with petitioners and their counsel. Without the aid of a brief on

petitioners' behalf containing "detailed findings of fact" based upon "specific, detailed, easily found and legible evidence," as directed by the Court, we are hard pressed to state with anything approaching remote certainty the final of countless inconsistent positions advanced by petitioners. We are absolutely convinced that the tactics employed by petitioners and their counsel were carefully calculated to prevent any meaningful resolution of their case. To the extent that we deal harshly with petitioners, petitioners have only themselves and their counsel to blame.

## A. *Disposition of Respondent's Motion*

We will first dispose of respondent's Motion for Entry of Default Judgment or Dismissal pursuant to Rule 123 with respect to all issues upon which petitioners bear the burden of proof.

Rule 151(a) provides, in part, that "Briefs *shall be filed* after trial or submission of a case, except as otherwise directed by the presiding Judge." (Emphasis added.)

Rule 123 provides, in part, as follows:

(a) Default: When any party has failed to plead or otherwise proceed as provided by these Rules or as required by the Court, he may be held in default by the Court either on motion of another party or on the initiative of the Court. Thereafter, the Court may enter a decision against the defaulting party, upon such terms and conditions as the Court may deem proper * * *

(b) Dismissal: For failure of a petitioner properly to prosecute or to comply with these Rules or any order of the Court or for other cause which the Court deems sufficient, the Court may dismiss a case at any time and enter a decision against the petitioner. The Court may, for similar reasons, decide against any party any issue as to which he has the burden of proof; and such decision shall be treated as a dismissal * * *

\*　　\*　　\*　　\*　　\*　　\*　　\*

(d) Effect of Decision on Default or Dismissal: A decision rendered upon a default or in consequence of a dismissal, other than a dismissal for lack of jurisdiction, shall operate as an adjudication on the merits.

Our Rule 151 *requires* that briefs be filed, except as otherwise directed by the presiding Judge. Thus, from the standpoint of the parties, the Rule is not couched in permissive language.

This Court long ago recognized the importance of filing a brief (*Klein v. Commissioner*, 6 B.T.A. 617 (1927)). The taxpayers in the *Klein* case had raised a statute of limitations defense against the alleged deficiencies. Counsel for both parties were expressly requested to submit briefs on the issue; however, no brief was ever filed on behalf of respondent. We commented on respondent's failure to file a brief as follows:

At the appointed time the brief of counsel for petitioners was filed, but none has been filed in behalf of respondent. We thus have but the argument of one side to consider. Whether we are to assume that the respondent concedes that the statute bars the deficiencies or that he leaves the question to be investigated by the Board without the assistance of counsel is not clear. We reject the latter alternative. It is the duty of counsel to ascertain the considerations and authorities supporting one side or the other and of the Board to judge. [6 B.T.A. at 623.]

The importance of a brief is underscored in a case such as the one currently before us where the contentions advanced by one of the parties are so ill-defined as to be unfathomable by the Court and are supported, if at all, by vague testimony and a mass of incomprehensible documents.

By the end of the rather lengthy trial, the Court was well aware that it would need specific clarification of the deductions and credits petitioners were claiming. To that end, the Court did not rely solely on the existence of Rule 151. It issued an oral directive to petitioners' counsel specifying the type of findings of fact the Court would need to understand petitioners' legal positions. Thus, by failing to file a brief in this case petitioners not only have violated a Rule of this Court but also have disregarded a specific and easily understandable oral directive of the Court. Under the circumstances, we believe that petitioners' inexcusable conduct not only warrants some sanctioning but, in fact, requires it. Petitioners have attempted to shift to the Court the burden of sifting through a 598-page transcript and a large number of exhibits, many of which are suspect in appearance, in order to ferret out petitioners' legal positions and whatever facts may support those positions. We will not accept this burden, nor should we. Our pending docket is well documented, and we can ill afford the time or the manpower to perform duties that properly rest with petitioners.

With respect to the proper means of sanctioning petitioners, respondent has requested that we render a default judgment pursuant to Rule 123(a) or dismiss petitioners' case pursuant to Rule 123(b) to the extent of those issues upon which petitioners bear the burden of proof. We entertain no reservations but that Rule 123 is broad enough to cover respondent's motion, and we can think of no persuasive reason why we, under the circumstances of this case and in the exercise of our discretion, should decline to grant that motion. The failure of petitioners and their counsel to comply with the dictates of Rule 151 and the specific directions of the Court, can be said to constitute a default under Rule 123(a), since they have "failed to * * * proceed as provided by these Rules or as required by the Court." Furthermore, the inactivity of petitioners and their counsel can be said to constitute a failure to properly prosecute pursuant to Rule 123(b), since there has been a "failure * * * to comply with these Rules or any order of the Court."

Although we have located no reported Tax Court case defaulting or dismissing a party for failure to file a brief, we consistently have given Rule 123 broad applicability. Thus, for example, Rule 123 has been applied when a party has refused to appear at trial, to stipulate, or to comply with Court-ordered discovery. See, e.g., *Long v. Commissioner*, 742 F.2d 1141 (8th Cir. 1984), affg. per curiam an order of dismissal by this Court for failure to stipulate; *Miller v. Commissioner*, 654 F.2d 519 (8th Cir. 1981), affg. per curiam an unpublished order of this Court dismissing for failure to stipulate; *Rechtzigel v. Commissioner*, 79 T.C. 132 (1982), affd. per curiam 703 F.2d 1063 (8th Cir. 1983)(refusal to comply with Court-ordered discovery); *Ritchie v. Commissioner*, 72 T.C. 126 (1979) (failure to appear at trial).

There is no question but that Rule 123 may be invoked after, as well as before, a trial has been held. In fact, Rule 123(b) by its very terms authorizes a dismissal "at any time." On numerous occasions, we in essence have defaulted or dismissed issues for failure to brief them. Generally, we have accomplished this result by considering the issue waived or conceded.[8]

---

[8]See, e.g., *Stonegate of Blacksburg, Inc. v. Commissioner*, T.C. Memo. 1974–213; *United Contractors, Inc. v. Commissioner*, T.C. Memo. 1964–68, affd. per curiam on other grounds 344 F.2d

Our Rule 123(a) was drafted along the lines of Rule 55(a) and (b), Federal Rules of Civil Procedure. Tax Court Notes to Rules, 60 T.C. 1129. The parameters of Fed. R. Civ. P. 55 were examined in *Alameda v. Secretary of Health, Education & Welfare*, 622 F.2d 1044 (1st Cir. 1980), vacating and remanding 463 F. Supp. 759 (D.P.R. 1979). That case involved the appeal of administrative denials of social security disability benefits. The District Court ordered the Secretary of Health and Human Services to file legal memoranda in support of her administrative decisions. The Secretary, however, failed to do so, whereupon the District Court rendered judgments for the claimants. On appeal, the Government argued that the District Court's action amounted to a default judgment against the United States, prohibited by Fed. R. Civ. P. 55(e).[9]

The First Circuit first upheld the District Court's authority to require a brief and in doing so stated as follows:

We fully agree with the district court that a government brief is often essential in helping a judge wend his or her way efficiently through a record sometimes dominated by medical specialists' nomenclature. We appreciate the burden processing disability claims places on the Secretary's shoulders, but see no justification in meeting this burden by shifting the task to an unaided district court and the claimant.

\* \* \* \* \* \* \*

The district court has authority to order the Secretary to submit memoranda of law \* \* \*. This authority is an inherent power, "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." [622 F.2d at 1046–1047; citations omitted.]

Although the First Circuit ultimately vacated and remanded the District Court's decision for failure to apply properly the unique burden of proof standard set forth in Fed. R. Civ. P. 55(e), the court acknowledged that the Government's failure to contribute a brief required some sanctioning and implicitly recognized that Fed. R. Civ. P. 55(e) would not prohibit a default judgment against the Government for failure to file a brief, so long as the claimant

123 (4th Cir. 1965). See also *Lysek v. Commissioner*, 583 F.2d 1088 (9th Cir. 1978), cert. denied 439 U.S. 830 (1978), affg. a Memorandum Opinion of this Court holding an issue to be waived when the taxpayers failed to amend their pleadings to conform to the evidence.

[9]Fed. R. Civ. P. 55(e) provides that "No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."

had established his claim by evidence satisfactory to the court. In addition, the court stated that "Were the Secretary a private litigant, we assume the court could have entered a judgment of default; the Secretary's failure to file the requested memoranda or even explain the failure after months of delay, amounted to a failure under Fed. R. Civ. P. 55(a) to 'otherwise defend' the suit." 622 F.2d at 1048.

Thus, it is clear that the court in *Alameda* recognized the importance of a brief and further recognized that the failure of a party to file a brief may justify, and in some instances require, the entry of a default judgment. As noted, the First Circuit vacated the District Court's decision, based solely on its conclusion that the evidentiary standards set forth in Fed. R. Civ. P. 55(e), for which our Rules contain no counterpart, had not been applied properly by the lower court.

Federal appellate courts also have recognized the importance of appellate briefs. When a brief has been filed, but fails to discuss a particular issue, appellate courts generally have considered the issue waived or conceded. See, e.g., *Harris v. Plastics Manufacturing Co.*, 617 F.2d 438 (5th Cir. 1980). Even if an issue is briefed, an appellate court may consider it waived if the brief makes no page references in the record of authorities for the position advanced. *Wallace v. Hudson-Duncan & Co.*, 98 F.2d 985 (9th Cir. 1938). When a party fails to file a brief altogether, or fails to file a brief complying with Rule 28, Federal Rules of Appellate Procedure, such failure has been held to justify dismissal of the appeal. *Stevens v. Security Pacific National Bank*, 538 F.2d 1387 (1976); *Harrelson v. Lewis*, 418 F.2d 246 (4th Cir. 1969); *Dickson v. Maryland Casualty Co.*, 102 F.2d 299 (5th Cir. 1939).

We conclude that petitioners' failure to file a brief, under the circumstances of this case, fully justifies the dismissal of all issues as to which petitioners have the burden of proof. Accordingly, respondent's motion to dismiss those issues pursuant to Rule 123(b) will be granted.

### B. *Disposition of Issues Upon Which Respondent Bears the Burden of Proof*

### 1. Deficiencies

By amended answer, respondent increased the determined deficiencies for all years in question. Respondent bears the

burden of proof on the increases in deficiencies. Rule 142(a). The only items of income entering into the increased deficiencies that have not been conceded by stipulation or otherwise agreed to are the consulting income received during 1978, the interest income received in 1979, and the rental income received during 1978, 1979, 1980, and 1981.

### a. 1978

In determining the consulting income received by Andrea in 1978, respondent relied extensively on his Exhibit AP, the diary maintained by Andrea during that year. As explained in our findings of fact, petitioners' counsel withdrew the exhibit from the record at the completion of trial, and despite a Court order directing him to return the exhibit, he returned only copies of certain pages of the diary, many of which are illegible. To the best of our ability we have attempted to verify respondent's calculation of consulting income based on the copies of Exhibit AP returned by petitioners' counsel. Unfortunately, there are some instances in which we simply are unable to read notations presumably relied upon by respondent, and our inability to do so places us in an unusual posture. Andrea admitted that the diary was the only remaining evidence of her 1978 consulting income. Under the circumstances of this case, we believe that it would be an error to hold that respondent has failed to carry his burden of proof with respect to the amount of consulting income received by Andrea in 1978. In our view, respondent has presented sufficient evidence on this issue to shift the burden of going forward with the evidence to petitioners. Petitioners presented no credible evidence whatsoever to rebut respondent's determination, and petitioners' failure to comply satisfactorily with the Court's order to return Exhibit AP gives rise to the inference that the exhibit, had it been returned, would have been unfavorable to petitioners' case. Therefore, we conclude and so hold that respondent has carried his burden of proving the amount of consulting income received by Andrea in 1978.

Respondent determined that petitioners received 10 months of rental income from the Dunkirk Road property at $400 per month in 1978, for a total of $4,000. The $400 figure is supported by the contemporaneously prepared mortgage application indicating a rental figure of $400 with respect to the

property. Taking inflation into account, the $400 figure is also consistent with the $425 rental charged to the succeeding tenants whose tenancy began during the following year. We found petitioners' testimony that they thought they charged $260-per-month rent totally lacking in credibility and accord it no weight. Respondent, in attempting to establish the starting date of the tenancy, relies on a notation of March 6, 1978, in Andrea's diary stating "C & P at Dunkirk disconnect/connect." Respondent asserts that it is reasonable to infer that the notation establishes the connection of new telephones for the new tenants. Fortunately, we are able to verify the accuracy of this notation from the copies of exhibit AP returned by petitioners' counsel, and under the facts of this case and in the absence of any evidence to the contrary, we believe that the notation serves as sufficient evidence that the tenancy began in March. Based on the foregoing, we conclude and so hold that respondent has carried his burden of proving the amount of rental income received by petitioners in 1978.

b. 1979

Respondent determined that petitioners received total interest income of $195 in 1979. Respondent's determination was apparently based on the information contained in the unsigned 1979 Form 1040 referred to in petitioners' verified answers to interrogatories. Respondent contends that the detailed admissions with respect to the payers of interest and the amounts thereof contained in the answers to interrogatories is the most credible evidence of petitioners' interest income during the year in question. Under the facts of this case, we agree and conclude that respondent's determination must be sustained. By virtue of our March 30, 1984, order, petitioners were precluded from contradicting or supplementing their answers to interrogatories. Although petitioners were relieved of our order to the extent that it precluded them from introducing additional documents, petitioners presented no credible documentation that they received interest income of a reduced amount.[10]

---

[10]At trial, petitioners' counsel made some attempt to disassociate the unsigned Forms 1040 from the verified answers to interrogatories, asserting that the Forms 1040 were delivered to respondent separately and were not attached to the answers. To the extent that counsel seeks to persuade us that our Mar. 30, 1984, order should not extend to the unsigned Forms 1040, we flatly reject such a suggestion. The answers to interrogatories clearly and in no uncertain terms incorporated the information contained in those unsigned Forms 1040.

Respondent determined that petitioners received 6 months of rental income from the Dunkirk Road property at $400 per month and 5 months of rental income from that property at $425 per month in 1978, for a total of $4,525. It is unclear, but apparently petitioners only dispute the $400 figure as discussed above in connection with the year 1978, since the $425 figure and the starting date of the new tenancy is established by documents stipulated into evidence. We have already concluded that respondent has satisfied his burden of establishing the $400 figure. Therefore, we conclude and so hold that respondent correctly determined that petitioners received total rental income of $4,525 from the Dunkirk Road property in 1979.

Respondent advances no independent proof of the amount of rental income petitioners received in 1979 from the Regester Avenue property. He relies, instead, on the unsigned 1979 Form 1040 referred to in petitioners' verified answers to interrogatories, wherein petitioners indicated that they received $5,100 of income from the property in 1979. Respondent contends that the admission in the interrogatory answers made from contemporaneous documents turned over to the preparer of the unsigned Form 1040 is clearly the most credible evidence of the receipts from the Regester Avenue property. Although petitioners disavowed the $5,100 figure at trial, they presented no credible evidence to support any reduced figure. By virtue of our order of March 30, 1984, we hold that petitioners received $5,100 of rental income from the Regester Avenue property in 1979.

Respondent determined that petitioners received 4 months of rental income from the Murdock Drive property at $365 per month in 1979 for a total of $1,460. Petitioners agree that they received this amount of rental income from the property in 1979.

c. 1980

Respondent determined that petitioners received 9 months of rental income from the Dunkirk Road property at $425 per month in 1980 for a total of $3,825. It is undisputed that the tenants of the property remained there through September 1980 and that the rental rate was $425 per month. It is also established that the security deposit held by petitioners was

forfeited to pay for part of the August rent and all of September's rent. Taking the forfeiture into account, respondent's calculations are correct, and we therefore hold that petitioners received $3,825 of rental income from the Dunkirk Road property in 1980.

In determining that petitioners received $5,100 of rental income from the Regester Avenue property in 1980, respondent relies on the unsigned Form 1040 for the year 1980 referred to in petitioners' verified answers to interrogatories, wherein petitioners indicated that they received that amount of income from the property in 1980. Although petitioners again disputed this $5,100 figure at trial, as they did with respect to their 1979 rental income from the property, petitioners presented no credible evidence to support any reduced figure. Our conclusion and holding with respect to the effect of the unsigned 1979 Form 1040 on respondent's determination of the amount of rental income received from the Regester Avenue property in 1979 applies equally with respect to the effect of the unsigned 1980 Form 1040 on respondent's determination of the amount of rental income received from the property in 1980. That is, we conclude and so hold that petitioners are bound by the $5,100 figure indicated on the unsigned Form 1040, which was incorporated by reference into their verified answers to interrogatories.

Respondent determined that petitioners received 8 months of rental income at $365 per month in 1980 from the Murdock Drive property for a total of $2,920. Petitioners apparently do not dispute that the property was rented for 8 months at $365 per month during that year. However, they claim that they disposed of that property in May 1980 by conveying it to a trust for the benefit of their children. Respondent disputes the substance of the alleged trust and contends that, even if the trust did have substance, the rental income collected after the alleged conveyance would still be taxable to petitioners because the lease itself was never assigned and petitioners continued to collect the rent and apply it to the payment of their personal liabilities. Although his testimony was vague and often contradictory, when pressed on the question, Ronald admitted that petitioners did not transfer the lease, itself, and that they continued to collect the rent, which they applied to a mortgage on which they were liable. We conclude and so hold

based on these admissions and the inherent incredibility of other contradictory testimony, that petitioners received $2,920 of rental income from the Murdock Drive property in 1980.

### d. 1981

Respondent determined that petitioners received a total of $5,750 of rental income from the Regester Avenue Property in 1981. As set forth in our findings of fact, the Regester Avenue property was subject to two different tenancies during 1981. Respondent acknowledges that the relative rental rates are not known, and he has resorted to his own calculations of the probable rates. There is no evidence in the record upon which we could conclude that respondent has carried his burden of proving that petitioners actually received rental income of $5,750 from the Regester Avenue property in 1981. Respondent's case on this particular issue is built on mere speculation. However, petitioners admit that they received some rental income from the property during the year in question. We find the most compelling admission the one contained in the unsigned Form 1040 for the year 1981 referred to in the verified answers to interrogatories, wherein petitioners indicated that they received $4,275 of rental income from the property in 1981. Therefore, we conclude and so hold that petitioners received a total of $4,275 of rental income from the Regester Avenue property in 1981.[11]

## 2. Addition to Tax for Fraud

Respondent bears the burden of establishing, by clear and convincing evidence, that some part of an underpayment for each year was due to fraud. Section 7454(a); Rule 142(b). Fraud, for purposes of the section 6653(b) addition to tax, has been defined as an intentional wrongdoing with the specific intent to evade a tax believed to be due and owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. *Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3d Cir. 1968); *Powell v. Granquist*, 252 F.2d 56, 60 (9th Cir. 1958). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Gajewski v. Commissioner*,

---

[11]We note that the 1981 Form 1040 filed 1 day before trial in this case actually reports a rental income figure of $4,900. Respondent does not rely on this information and, in fact, acknowledges that the "latest 'returns'" deserve to be totally ignored. We agree with respondent that these latest Forms 1040 fundamentally are lacking in reliability.

67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).

The record in this case is replete with indicia of fraud, and the conclusion that petitioners engaged in a course of conduct intended to conceal their taxable income for the years 1978, 1979, 1980, and 1981 is inescapable.

The evidence reveals that both petitioners were educated. They were both aware of the responsibility of filing proper income tax returns, and in fact filed returns for the years preceding the years in issue. However, petitioners filed a form not constituting a return for 1978 and initially failed to file any returns whatsoever for the succeeding 3 years. Although petitioners eventually filed returns for the years in question, we have concluded and found as a fact that the making of those returns did not represent an honest attempt to determine correctly their taxes. Attached to at least two of those returns were altered Forms W-2 prepared by petitioners' counsel.[12] For some of the years in question, petitioners knowingly filed false Forms W-4 or W-4E claiming to be exempt from withholding and certifying their lack of tax liability. Failure to file returns is not conclusive evidence of

---

[12]In this connection, the following portion of the trial transcript fairly can be called startling.

MR. WILES: Your Honor, I would like to flush this out a little bit. Is it Mr. Tranakos's testimony that he and not the employer prepared a W-2?

MR. TRANAKOS: Oh, yes. Where is it?

(Pause while locates document)

Yes. That is—show it to me.

MR. WILES: Here it is.

(Counsel shows document to Mr. Tranakos)

MR. TRANAKOS: That document was prepared by our office, Your Honor. It was not prepared by the State of Maryland or whoever it was so that is correct.

THE COURT: I don't understand, Mr. Tranakos. Did you prepare something that purports to be a W-2?

MR. TRANAKOS: It is on a W-2 form, Your Honor.

\* \* \* \* \* \* \*

MR. TRANAKOS: It is a correction, Your Honor. It is to show the correct withholding and all that other data which should be on there to reflect the income that she had from working as a salaried employee as separated from her contract work that appears on Schedule C.

THE COURT: By what right do you prepare a W-2 form on behalf of the State of Maryland?

MR. TRANAKOS: Well, we weren't preparing it on behalf of the State of Maryland. We were preparing it primarily to show the Internal Revenue Service what would be the correct split between wages and contract.

We have a form from the State of Maryland that says that. That is already in evidence as well.

THE COURT: This purports to be a form prepared by the State of Maryland.

MR. WILES: It sure does.

MR. TRANAKOS: It's—well, it's not intended to reflect the State of Maryland prepared that form.

THE COURT: Mr. Tranakos, I view that with a great deal of seriousness.

fraud, but is a factor worthy of consideration, particularly when coupled with the submission of false withholding forms. *Hebrank v. Commissioner*, 81 T.C. 640, 642 (1983); *Habersham-Bey v. Commissioner*, 78 T.C. 304, 313 (1982).

The presence of fraudulent intent is clearly and convincingly established through numerous other facts of record, only a few of which need be mentioned herein.

Petitioners' refusal to cooperate with respondent in an effort to determine their correct liability, in the context of this record, is indicative of fraud. *Rowlee v. Commissioner*, 80 T.C. 1111, 1125 (1983). From the outset of the audit phase of this case, petitioners failed to produce for respondent's examination, books or records reflecting their income for the years in question. The evidence of record clearly suggests some destruction of income records after the audit began. We find petitioners' professed lack of any such records particularly curious in light of the fact that they managed to accumulate and retain innumerable receipts for items purchased, which petitioners alleged to be deductible. Petitioners also refused to firm up their contentions with respect to income and deduction items. Instead, they presented inconsistent and ever-changing positions in a transparent effort to delay progress in their case and to confuse respondent. We entertain no doubts but that petitioners' conduct towards respondent was an attempt to implement the teachings of their counsel, who has spoken on such subjects as "How to Trip Up the Government Agents."

Petitioners non-cooperation continued throughout the litigation phase of their case. Time and again they forced respondent to seek Court compulsion of discovery causing further delay in the resolution of their case. Petitioners' responses to Court orders bordered on contempt. On more than one occasion the Court advised petitioners and their counsel that it considered their conduct unacceptable or inexcusable. Petitioners largely ignored orders to turn over all relevant documents prior to trial, preferring instead to flood the Court in the course of the trial with innumerable pieces of paper which allegedly supported deductions. We found petitioners' explanations with respect to what those pieces of paper represented, as well as the bulk of their testimony in general, contradictory and highly incredible. The fact that petitioners failed to file a brief in this case, when they surely knew that

the Court could not possibly ferret out their final positions on issues without the aid of a brief, is a predictable course of conduct considering their obvious intent to frustrate the proper operation of the court system. In short, we cannot help but consider petitioners' conduct throughout the entire audit and trial of their case as indicative of an intent to conceal, mislead, or otherwise prevent the collection of taxes.

Finally, we note that the addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. *Helvering v. Mitchell*, 303 U.S. 391, 401 (1938); *Rowlee v. Commissioner, supra* at 1123. In keeping with this purpose, the addition to tax for fraud for all of the years in question is clearly warranted.

> *Appropriate orders and decisions under Rule 155 will be entered.*

Reviewed by the Court.

DAWSON, FAY, SIMPSON GOFFE, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, and WRIGHT,, *JJ.*, agree with this opinion.

WILBUR and GERBER, *JJ.*, did not participate in the consideration of this case.