JOHN W. HOUGH AND LOUISE C. HOUGH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hough v. Commissioner
Docket No. 22200-82.
United States Tax Court
T.C. Memo 1986-229; 1986 Tax Ct. Memo LEXIS 381; 51 T.C.M. (CCH) 1141; T.C.M. (RIA) 86229; June 5, 1986. John W. Hough, for the petitioners. Vikki L. Pryor, for the respondent. KORNER
MEMORANDUM OPINION "KORNER, Judge: Respondent determined a deficiency of income tax against petitioners with respect to their calendar year 1977 in the amount of $33,568.68. The sole issue presented for our determination is whether a loss suffered by petitioner John *382 W. Hough in 1977, on account of the worthlessness in that year of a bad debt, should be treated as a fully deductible business bad debt under the provisions of section 166(a), [1] or should be treated as a nonbusiness bad debt within the meaning of section 166(d), and therefore deductible only as a short-term capital loss, under the provisions of section 1211. Many of the facts herein were stipulated, and such facts are incorporated herein by this reference. At the time the petition herein was filed, petitioners were residents of Lake Forest, Illinois. They filed a joint individual income tax return for the year 1977. Petitioner John W. Hough (hereinafter "petitioner") was licensed to practice law in Illinois in 1952 and has thereafter continuously practiced law in Chicago, Illinois, except for a period of military service between November 1953 and March 1957. In the years 1965 through 1976, he was a partner in the Chicago law firm of Keck, Mahin & Cate. General *383 Alloys Company (hereinafter "GA"), was a corporation founded in 1922 by one H. H. Harris, and was for a number of years engaged in the foundry business of producing heat and corrosion resistant high alloy castings. Mr. Harris served as president and chief executive officer of GA from its founding until his death on June 28, 1965. In the early 1930's, Mr. Harris caused petitioner's father, Charles F. Hough, to be retained as legal counsel to GA and to become a member of its Board of Directors, positions held by the elder Mr. Hough until his death in 1968. Upon the death of Mr. Harris in 1965, petitioner became the sole executor of his estate, which included 57,145 shares of GA stock. Upon the conclusion of the administration of that estate, its remaining assets, including said stock, were transferred to the H. H. Harris Residuary Trust, which is now a charitable trust known as the H. H. Harris Foundation. Petitioner has continuously served as the sole trustee of the H. H. Harris Residuary Trust and the resulting H. H. Harris Foundation, which has continued to hold 57,145 shares of GA common stock. Petitioner was elected to the board of directors of GA in July 1965, and continued *384 to serve in such capacity until December 30, 1973. He served as chairman of the board of directors of GA for the period February 1, 1969 to December 30, 1973. He also served as chairman of a three-man executive committee of the board of directors of GA for the period September 20, 1969 to December 30, 1973, and served as chief executive officer and chief operating officer for GA for the periods February 1, 1971 to May 15, 1971 and October 15, 1972 to December 30, 1973. In addition to the above positions which petitioner held with GA, petitioner's law firm of Keck, Mahin & Cate served as counsel to GA for the years 1965 through 1976, and also served as counsel to GA's wholly owned subsidiary, Hanford Foundry Company (hereinafter "Hanford") for the period 1969 through 1972. All compensation for petitioner's services, whether as counsel to the company, corporate officer, or director, were billed by and paid to petitioner's law firm. For the years 1965 through 1969, the total fees and reimbursed expenses received by the law firm from GA annually ranged from a low of $1,650 to a high of $5,402.79. No fees were received from GA in the years 1970 through 1972, although during these *385 three years expenses were reimbursed to the law firm by GA in the total amount of approximately $8,750. As of July 1, 1971, GA owed the law firm $41,250 in fees and $4,631.25 for out of pocket disbursements. Although GA and Hanford were clients of petitioner's law firm, they were not major or principal clients. The foundry business of GA, since its inception, had been conducted in Boston, Massachusetts. GA acquired Hanford as a wholly owned subsidiary at the end of 1968, and, in January 1970, GA discontinued its foundry operations in Boston and moved those operations to the facilities of Hanford in San Bernardino, California. This move, however, was apparently not successful from a business standpoint, since the two product lines of GA and Hanford did not mix well. Accordingly, GA sought to move its foundry operations elsewhere, and, in the latter part of 1970, began operations at the facilities of Castwell Company (hereinafter "Castwell"), in Fort Scott, Kansas. GA desired to purchase the operating assets of Castwell but, because of business vicissitudes and large losses, GA was unable to borrow the necessary money from any outside source. Accordingly, on July 1, 1971, petitioner *386 loaned GA the sum of $132,000 in return for a note, which was secured by a pledge agreement by GA with respect to certain royalties receivable by it under a license agreement. The proceeds of this not were used by GA, to the extent of $130,750, for the purpose of acquiring the operating assets of Castwell. Beginning in May 1972, payments were commenced on the note until total payments of $62,272.47 were made. The unpaid balance of the note, in the amount of $69,727, became worthless in 1977. GA's foundry operations at Castwell were short lived, and after 1971, GA became inactive, with its remaining assets consisting principally of its stock in Hanford, which in turn went through a bankruptcy reorganization under Chapter 11 of the Bankruptcy Act, beginning in May 1973. At the time petitioner made his loan to GA, petitioners individually owned 11,200 shares of GA common stock, with a cost price of $46,375, and a market value of $39,200. In November 1971, petitioners acquired additional shares of GA stock, bringing their total ownership up to 15,000 shares, and their total cost up to approximately $60,000. At July 1, 1971, the stock of GA was publicly held, with 546,895 shares *387 outstanding. In their joint individual income tax return for 1977, petitioners claimed an ordinary loss deduction of $69,727 as a business bad debt, on account of the worthlessness of the remaining balance of petitioners' loan to GA. Upon audit, respondent, while acknowledging the amount and the date of the worthlessness of the debt, determined that the deduction was allowable only as a nonbusiness bad debt, and was therefore deductible only as a short-term capital loss, subject to the restrictions of section 1211. The dispute between the parties, then, is whether the bad debt in question here is to be treated as a business bad debt or a nonbusiness bad debt under the provisions of section 166. In resolving this question, the correct legal standard has been laid down by the Supreme Court in United States v. Generes,405 U.S. 93 (1972), rehearing denied 405 U.S. 1033 (1972). In that case, having a remarkable similarity to the case at bar, the Court said: The fact responsible for the litigation is the taxpayer's dual status relative to the corporation. Generes was both a shareholder and an employee. These interests are not the same, and their differences *388 occasion different tax consequences. In tax jargon, Generes' status as a shareholder was a nonbusiness interest. It was capital in nature and it was composed initially of tax-paid dollars. Its rewards were expectative and would flow, not from personal effort, but from investment earnings and appreciation. On the other hand, Geners' status as an employee was a business interest. Its nature centered in personal effort and labor, and salary for that endeavor would be received. The salary would consist of pre-tax dollars. Thus, for tax purposes it becomes important and, indeed, necessary to determine the character of the debt that went bad and became uncollectible. Did the debt center on the taxpayer's business interest in the corporation or on his nonbusiness interest? If it was the former, the taxpayer deserves to prevail here. * * * We conclude that in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations [2] specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * * [405 U.S. 93, 100-101, 103; *389 citations omitted.] In determining what petitioners' dominant motivation was in making the loan to GA under the above legal standard, the question presented is factual, and petitioner has the burden of proving that his dominant motivation was business related, as opposed to nonbusiness. See Putoma Corporation v. Commissioner,66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979). We hold that petitioner has failed to carry his necessary burden of proof on this issue. The only witness at trial was petitioner himself. On the question of his motivations in making the loan to GA, he testified as follows: Q. Well, can you testify what your motivations were? A. My motivations were, one, to save the investment of the trust that I served, the Harris Residuary Trust, to preserve my investment so that also generate fees in the future for myself as a lawyer for not only General Alloys Company, Hanford Foundry Company and the H. H. Harris Residuary Trust. And I would have to also say another motivation I had was to save the jobs of about 250 people at Hanford Foundry *390 Company as employees. That was a true motivation to me. In addition, before the instant case was begun, and while it was still under audit by respondent, petitioner wrote a letter to respondent, in reply to a query from the latter as to his dominant motives for making the loan, in which petitioner said the following: The dominant motives for making the loan were that besides being Chairman of the Board of General Alloys Company, I had a substantial stock investment in the company as well as indirectly held as Trustee another substantial investment in the company. * * * It is apparent from the above quotations that petitioner had a mix of motives in making the loan to GA. We cannot find that the dominant motive in making the loan was a directly connected business interest of petitioner. There is no evidence in this record that petitioner was in the money-lending business.Further, given the fact of the very modest fees which GA paid for all the various services which petitioner performed as chief executive officer, chief administrative officer, chairman of the board of directors, and counsel to the company (and there were no such fees paid in 1970, 1971 or 1972) as compared *391 to the substantial stock investment which petitioners had in GA, we cannot believe that petitioner's dominant motivation in making the loan was to protect a source of income as a corporate employee or counsel to the company; and this is especially true when it it noted that all such fees went to petitioner's law firm in which he would only realize a share corresponding to his partnership interest (not disclosed in this record). We note one final matter. At the conclusion of trial herein, the Court directed that simultaneous briefs be filed by the parties, together with simultaneous reply briefs. This was a direction by the Court that the parties marshal what they considered to be the relevant facts and legal arguments and present them to the Court, for its assistance in resolving the issues presented. Pursuant to this direction, petitioner had a obligation to assist the Court by organizing the material presented at trial. Cf. Stringer v. Commissioner,84 T.C. 693 (1985); Primoff v. Commissioner,T.C. Memo. 1985-562. Although respondent filed a brief in accordance with the Court's instruction, petitioners filed none. Under the circumstances, *392 we would be justified in deciding this case in favor of respondent on the basis that petitioners' failure to file a brief constituted a concession of the issue presented. See Calcutt v. Commissioner,84 T.C. 716, 721-722 (1985); Bender v. Commissioner,T.C. Memo. 1985-375; Stonegate of Blacksburg, Inc. v. Commissioner,T.C. Memo. 1974-213. We forebear to do so in this case, but we do decide the disputed issue against petitioners because of their failure to satisfy their necessary burden of proof. Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. The reference in the quotation is to sec. 1.166-5, Income Tax Regs.↩