GORDON KINKAID, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kinkaid v. Commissioner
Docket No. 18954-84.
United States Tax Court
T.C. Memo 1987-548; 1987 Tax Ct. Memo LEXIS 540; 54 T.C.M. (CCH) 988; T.C.M. (RIA) 87548; October 27, 1987. Gordon Kinkaid, pro se. Donna J. Pankowski, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice of deficiency dated April 13, 1984, respondent determined deficiencies in and additions to petitioner's 1978, 1979, and 1980 Federal income tax liabilities as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1978
$  29,601
$ 18,441
1979
71,024
35,512
1980
121,090
60,545
The primary issues for decision are: (1) The amounts *541 by which petitioner understated taxable income for each of the years in issue, and (2) whether petitioner is liable for the additions to tax under section 6653(b). FINDINGS OF FACT Many of the facts have been stipulated and are so found. Petitioner resided in White Oak, Pennsylvania, at the time he filed his petition. During the years in issue, petitioner was married to Margaret Kinkaid who is now deceased. [2]
Petitioner is a naval architect. In 1966, petitioner started his own business, developing computer programs for use in the construction of ships. As sole proprietor, petitioner operated his business under the name of S. G. Kinkaid & Associates. Between 1966 and 1975, S. G. Kinkaid & Associates performed consulting services for, among others, a shipbuilding company named Sun Shipbuilding & Drydock Co. ("Sun Shipbuilding"). Also in the early 1970's, petitioner was an employee of Maryland Shipbuilding & Drydock Co. ("Maryland Shipbuilding"). In 1975, *542 petitioner in his individual capacity became a full-time employee of Sun Shipbuilding as a numerical control expert. In that capacity, petitioner developed "lofting" systems, which are computer software systems used in the construction of ships. After becoming employed by Sun Shipbuilding in 1975, petitioner continued to do independent consulting for other shipbuilders. In early 1978, petitioner and Margaret registered to do business under fictitious names in Delaware. Petitioner registered under the name of Albert Homman. Margaret registered under the name of Olga Sullima. On February 28, 1978, petitioner incorporated Baltimore Marine Services, Inc. ("BMS"), using the name of A. Homman, as incorporator. A. Homman also was the name petitioner used in the corporate documents to identify himself as president of BMS, and Olga Sullima was the name used to identify Margaret as secretary and treasurer. The vice president of BMS was Leamon Martin, a business associate of petitioner. BMS, like S. G. Kinkaid & Associates, was formed to provide consulting services to the shipbuilding industry. In providing those services, BMS contracted with petitioner to use a lofting system designed *543 by petitioner and referred to in some of the corporate documents as the "K-Loft system." By corporate resolution dated March 1, 1978, the Board of Directors of BMS described payments petitioner was to receive from BMS in exchange for its right to use the lofting system petitioner designed, as follows: WHEREAS, it has been jointly and severally agreed that the value of this software is One Million Dollars, ($ 1,000,000), and WHEREAS, the Board of Directors of this Corporation has determined that the Corporation has insufficient funds to enable it to purchase the software system, be it RESOLVED, that the Board of Directors hereby authorizes the Secretary of the Corporation, in consideration of the Corporations use of the K-Loft system, to make certain payments to S. Gordon Kinkaid. These payments shall be in the form of loans, and shall bear no interest, neither shall these loans be made unless the Corporation by direct use of the K-Loft System generates sufficient funds, to enable it to make these advances without injury or penalty to the Corporation, and it is FURTHER RESOLVED, that these payments will be in accordance with the following schedule: 1979
Total accumulated advances not to exceed
$   250,000
1980
Total accumulated advances not to exceed
500,000
1981
Total accumulated advances not to exceed
750,000
1982
Total accumulated advances not to exceed
1,000,000
1983
Total accumulated advances not to exceed
1,250,000
*544 Neither the March 1, 1978, corporate resolution, nor any other documents, described the terms for the repayment, if any, of the amounts petitioner was to receive under the above resolution "in the form of loans." During the years 1978, 1979, and 1980, BMS made the following total payments directly or indirectly to petitioner or to Margaret: Year
Amount
1978
$   96,781.81
1979
174,875.20
1980
273,008.22
Total
$ 544,665.23
From 1978 through early 1979, petitioner and Mr. Martin performed a majority of the work of BMS, and BMS hired naval architects and engineers to work part time as independent contractors. BMS originally operated out of the business offices of a Baltimore shipbuilding company, but in 1979 BMS obtained its own office space and hired Mr. Martin as a full-time consultant. The books and records of BMS were maintained by Margaret and were kept in the Kinkaid home during each of the years in issue. Petitioner and Margaret untimely filed their joint Federal income tax return for 1978 on May 1, 1979. They timely filed their joint Federal income tax returns for 1979 and 1980. On their 1978, 1979, and 1980 tax returns, petitioner *545 and Margaret reported total income of $ 46,470, $ 43,553.43, and $ 86,037.05, respectively. On the 1978 return, petitioner reported his salary of $ 32,775 from Sun Shipbuilding, and his salary of $ 4,128.65 from Maryland Shipbuilding. On the 1979 return, petitioner reported his salary of $ 38,105 from Sun Shipbuilding and his salary of $ 4,059.47 from Maryland Shipbuilding. On the 1980 return, petitioner reported his salary from Sun Shipbuilding of $ 32,349.61 and a salary of $ 41,750 that Margaret received from BMS. None of the payments petitioner and Margaret received from BMS in 1978, 1979, and 1980 were reported on their joint Federal income tax returns for those years with the exception of the $ 41,750 received by Margaret from BMS in 1980 that was reported on the 1980 joint Federal income tax return. Specifically, none of the payments petitioner received from BMS with respect to BMS' use of petitioner's lofting system were reported on the joint Federal income tax returns filed by petitioner and Margaret. All of the amounts paid in 1978, 1979, and 1980 by BMS to petitioner with respect to BMS' use of petitioner's lofting systems were, however, reported by BMS as deductible *546 professional fees on its Federal corporate income tax returns for those years. Many of the payments by BMS to petitioner during the years 1978, 1979, and 1980 were made by checks of BMS with notations thereon that they were being paid for professional services or fees. The books and records of BMS also described the payments to petitioner as payments for professional services or fees. Except in the corporate resolution previously quoted, nowhere in the books and records of BMS during the years 1978, 1979, and 1980 are the substantial payments made by BMS to petitioner identified as loans to petitioner or accounts receivable due from petitioner. In 1980, a Federal grand jury began investigating BMS. In January and March of 1982, petitioner and Margaret filed amended joint Federal income tax returns for 1978, 1979, and 1980, increasing taxable income for payments they received from BMS in the amounts of $ 98,705 in 1978, $ 146,789 in 1979, and $ 227,166 in 1980. [3] On the amended returns, they reported total taxable income of $ 130,914 in 1978, $ 171,300 in 1979, and $ 285,092 in 1980. *547 In January of 1983, petitioner was indicted in the United States District Court for the Eastern District of Pennsylvania on ten counts of mail fraud under 18 U.S.C. sec. 1341 (1982) and on five counts of filing Federal false income tax returns for 1976 through 1980 under 26 U.S.C. sec. 7206(1) (1982). On September 30, 1983, petitioner entered guilty pleas to three charges of filing false Federal income tax returns for 1978, 1979, and 1980. The remaining 12 counts of the indictment were dismissed. On December 8, 1983, petitioner filed documents entitled "Amended U.S. Individual Income Tax Return Twice-Amended" for each of the years in issue (hereinafter sometimes referred to as the "twice-amended returns"). [4] On the twice-amended returns, petitioner reported taxable income in amounts that exceeded the income reported on the original returns but that was less than the amounts that were reported on the first set of amended returns filed in 1982. For 1978, 1979, and 1980, the twice-amended returns reported taxable income of $ 123,901, $ 125,088, and $ 176,756, respectively. *548 On December 30, 1983, petitioner remitted two checks totaling $ 141,653 to respondent representing additional taxes he apparently admits to owing, less amounts previously paid. On April 13, 1984, respondent mailed to petitioner the notice of deficiency at issue herein in which respondent increased petitioner's taxable income for 1978, 1979, and 1980 to the taxable income figures reported by petitioner and Margaret on the first set of amended Federal income tax returns they filed in 1982. We summarize the taxable income reported on the three sets of income tax returns petitioner and Margaret filed, as follows: Taxable Income
Original
First-
Twice-
Year
Returns
Amended Returns *
Amended Returns
1978
$ 32,105
$ 130,914
$ 123,901
1979
24,676
171,300
125,088
1980
50,366
285,092
176,756
OPINION
Unreported Income
The first issue for decision is the correct amount of taxable income to be reported on petitioner and Margaret's joint Federal income tax return for each of the years in issue. Petitioner *549 concedes that the original returns understated taxable income, but he insists that respondent's determination of taxable income is excessive. [5] Respondent's determination of petitioner's unreported taxable income is presumptively correct and will be sustained unless petitioner proves respondent erred in his determination. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner argues that the twice-amended returns filed at the conclusion of the criminal proceedings accurately reflect the correct income received in 1978, 1979, and 1980. He contends that those amounts were computed by respondent's special agent assigned to the case, and therefore, those amounts represent admissions by respondent of the total amounts by which petitioner underreported income for the years at issue herein. We do not agree. In Federal district court, Gordon was charged with filing false income tax returns under section 7206(1). In the instant proceeding, he is *550 contesting respondent's determination of unreported income and additions to tax under section 6653(b) for civil tax fraud. The proceedings are distinct, and a judgment in one proceeding does not preclude resort by respondent to the other. Spies v. United States,317 U.S. 492, 495 (1943); United States v. Sabourin157 F.2d 820, 821 (2d Cir. 1946), cert. denied 329 U.S. 800 (1947). See also Harper v. Commissioner,54 T.C. 1121, 1138 (1970) (Court reviewed). In the criminal proceeding, the special agent based his computations of the taxes owed by Gordon (i.e., approximately $ 152,000) on evidence that he had compiled for purposes of recommending criminal prosecution. That evidence established that Gordon underreported income. The high standard of proof imposed on the Government in criminal proceedings commonly results in the use of taxable income figures for purposes of a criminal prosecution that are different from those used for civil purposes in determining the taxpayer's corrected Federal income tax liability. See One Lost Emerald Cut Stones v. United States,409 U.S. 232, 235 (1972) (per curiam); *551 Helvering v. Mitchell,303 U.S. 391, 402-403 (1938). In addition, no credible evidence was offered to support petitioner's claim that respondent agreed that the taxable income figures used in the criminal proceeding would also be used by respondent in the civil context. Petitioner alternatively argues that the income figures reported on the amended returns filed in 1982, upon which respondent's notice of deficiency is based, are overstated. According to petitioner, he learned in 1981 (after the grand jury investigation had started) that the payments he received from BMS possibly should not have been treated as loans but as taxable income. While he and Margaret were in Europe, petitioner instructed his accountant to prepare from the books and records of BMS amended joint Federal income tax returns for 1978, 1979, and 1980. Such returns were prepared, signed by petitioner and Margaret, and filed. Petitioner now contends that the accountant erred by including in his and Margaret's taxable income amounts he received from BMS that actually were loans. Furthermore, petitioner insists that from December of 1981 through June of 1982, he paid BMS $ 151,040 in partial *552 repayment of the alleged loans. Based on those alleged repayments, petitioner argues that at least $ 151,040 of the additional income in question in the years 1978, 1979, and 1980 should not be treated as taxable income to him. We find Gordon's arguments regarding the alleged loans conflicting and unpersuasive. The amended tax returns filed by petitioner and Margaret in 1982 treated the payments received from BMS as taxable income. The books and records of BMS indicate that the "loan" payments to petitioner and Margaret in 1978, 1979, and 1980 were for "professional fees," "professional services," "consulting fees," or "wages." It is ludicrous for petitioner now to claim that the payments were loans when the books and records clearly indicate that the payments were compensation for services rendered. Whether or not petitioner paid $ 151,040 to BMS in 1981 or 1982, cannot, under the facts of this case, change the taxable character of the payments received in 1978, 1979, and 1980. Also included on the amended tax returns filed in 1982 as additional taxable income were the following amounts: $ 16,444.42 paid by BMS at the direction of petitioner to petitioner's brother, $ 55,000 *553 transferred directly by BMS to the Bank of Delaware, and $ 107,638.50 transferred by BMS to a law firm in Great Britain. Petitioner offered no explanation as to why BMS paid $ 16,444.42 to his brother. The books and records of BMS indicate that the $ 55,000 check to the Bank of Delaware was for professional fees owed to petitioner, and that the check was used to purchase treasurer's checks that were deposited in petitioner's personal bank account. Petitioner acknowledged that the $ 107,638.50 paid to the British law firm represented an investment made by BMS on petitioner's behalf. For the reasons stated, we sustain respondent's determinations of petitioner's tax deficiencies for each of the years 1978, 1979, and 1980.
Section 6653(b) Addition to Tax
Section 6653(b) [6] provided an addition to tax of 50 percent of the amount of the tax deficiencies if any part of the underpayment was due to fraud. To sustain fraud determinations under section 6653(b), respondent has the burden of proving by clear and convincing evidence (1) that there was an underpayment of tax and (2) that some portion of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b), *554 Tax Court Rules of Practice and Procedure. Substantial underpayments of tax for 1978, 1979, and 1980 have been clearly and convincingly shown. Accordingly, the first element of fraud is established. To establish the second element under section 6653(b), respondent must demonstrate by clear and convincing evidence that the taxpayer had the specific intent to evade a tax due and owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Stringer v. Commissioner,84 T.C. 693, 713 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986). Fraud need not be established by direct evidence, but may be established from all of the relevant facts and circumstances. Goldberg v. Commissioner,239 F.2d 316, 320 (5th Cir. 1956); *555 Kotmair v. Commissioner,86 T.C. 1253, 1260 (1986); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The sustantial understatements of income on petitioner and Margaret's 1978, 1979, and 1980 joint Federal income tax returns, petitioner's criminal conviction under section 7206(1), the inconsistences between the books and records of BMS (including BMS' corporate tax returns) and petitioner's original tax return, petitioner's use of fictitious names, among other evidence, establish the required element of fraud in this case for each of the years before us. Cf. Wright v. Commissioner,84 T.C. 636, 643-644 (1985). Respondent's additions to tax under section 6653(b) are sustained. One of petitioner's excuses for the errors made on his tax returns deserves particular mention. He refers to a private publication he received in 1980 which describes in general and vague language interest free loans a closely held corporation may be able to make to its shareholders, thereby avoiding a tax that would be imposed at the shareholder level on dividends and a tax *556 at the corporate level on interest if interest accrued on the shareholder loans. The article petitioner makes reference to is so obviously a mere summary (and a confusing one at that) of the tax benefits of making loans to shareholders that petitioner could not reasonably have relied on the article as proper legal authority for disguising as loans the salary or fee payments he received from BMS. In light of our resolution of the above two issues, it is not necessary to address alternative arguments made by respondent. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. Although the notice of deficiency was addressed to Gordon Kinkaid and the Estate of Margaret Kinkaid, Deceased, only Gordon filed a petition with this Court for redetermination of the deficiencies herein. ↩
3. The amount of the payments from BMS that petitioner and Margaret reflected on their amended Federal income tax returns as additional taxable income apparently represented only direct payments by BMS to petitioner and Margaret. This explains the difference between the payments from BMS that were reflected on the amended tax returns and the total of the direct and indirect payments received from BMS, as indicated on page 5, supra.↩
4. Petitioner altered the jurat on each of the twice-amended returns by striking the language "under penalties of perjury." ↩
*. Represents amount of taxable income determined by respondent in the notice of deficiency at issue herein. ↩
5. As stated, respondent's determination of unreported taxable income is based on petitioner and Margaret's amended Federal income tax returns filed in 1982. ↩
6. Sec. 6653(b) provides, in relevant part, as follows: (b) Fraud. -- (1) In General. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. ↩