T.C. Memo. 2010-252

UNITED STATES TAX COURT

SHARON LOUISE GRIFFIN, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket No. 10285-07.          Filed November 17, 2010.

Sharon Louise Griffin, pro se.

<u>Loren Mark</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Sharon Louise Griffin worked part time as a
videotape operator and technician.  But, if her returns are to be
believed, she operated nine businesses in her spare time,
grossing $2,876,957 during 2001-2003, but ending up in the red
each year.  She doesn't contest her receipt of income, but

disputes the Commissioner's disallowance of her claimed expenses and other deductions.

## FINDINGS OF FACT

Griffin worked in Los Angeles' entertainment industry as a videotape operator and technician. She was essentially a temp filling in for absent employees at companies such as ABC, NBC, Univision, etc. She claims an inability to recall how many days a year she worked--declining to give even a rough estimate. But she worked enough to earn over $70,000 annually in wages from 2001-2003.

Griffin was also an entrepreneur, who tried to supplement her income through many other jobs in the South Los Angeles neighborhood she called the "Jungle".[1] Her entrepreneurial endeavors are reflected in her 2001, 2002, and 2003 tax returns, where she reported the following nine businesses on separate Schedule Cs:

- Delivery Service,

- Video Production,

- Janitorial Maintenance Service,

- Computer Repair Service,

- Handyman Service,

_____

[1] It is a neighborhood apparently well-known for its lush plant life. Griffin explained the origins of the name--"If you go over there it's inhabited with overgrown trees so it looks like a jungle."

- Landscape Maintenance Service,

- Parking Lot Maintenance/Steam Cleaning Service,

- Consulting Service, and

- Notary/Process Server Service.

Millions of dollars flowed through these businesses, but Griffin claimed enough expenses to eliminate any taxable income.

The record has no direct evidence showing why Griffin would spend so much effort to operate nine businesses when she would lose money year after year--especially since she earned a reasonably good wage in the entertainment industry.  The Commissioner points to a lack of "sufficient veracity" in her testimony.  Certain aspects of her testimony were indeed unusual. For example, she was reluctant to give her home address, referring instead to a P.O. box.  And the only business address she had for her numerous enterprises was an 800-square-foot warehouse/storage facility, because she tries "not to do business at home."

Griffin also dealt almost entirely in cash.  She explained that "I'm not the kind of person who would write a check to somebody I don't know because it has all my information on it." She also avoided banks and the paper trail their records tend to create.

> THE COURT:  So it never was to the point where you were making large deposits to banks, or buying money orders or something?

THE WITNESS:  No, because then I would have had to file a CTR.[2]

THE COURT:  And that was too much of a hassle for you?  You wouldn't want to get into that?

THE WITNESS:  It is in the Jungle and certain other number neighborhoods.

When asked what she did with so much cash, she replied:  "I didn't have hundreds and thousands of cash lying around.  I was giving it to people."

THE COURT:  So the idea would be to spend it on stuff right away?

THE WITNESS:  That's the idea because people will steal things from you, but if they know they have to negotiate it to get it into some spendable form, it's less of an encouragement to them to take it from you. If you have cash, that's not traceable.

This testimony affected our findings on the particular issues presented.

Griffin filed her 2001 and 2002 returns about two years late, and her 2003 return about a year late.  The Commissioner audited her returns in 2005, and issued a notice of deficiency in 2007.  In it, the Commissioner denied various deductions and asserted the failure-to-file and accuracy-related penalties. Griffin timely petitioned the Tax Court for redetermination of the deficiencies and penalties and the trial delved into the

---

[2] Griffin was apparently using a common abbreviation for currency transaction reports.  CTRs are designed to prevent money laundering, and banks are required to file them with the government for currency transactions in excess of $10,000.  31 C.F.R. sec. 103.22(b)(1) (2010).

specifics of each of Griffin's businesses during the years at issue.

## OPINION

Section 162(a)[3] allows a deduction for ordinary and necessary business expenses, but taxpayers must substantiate the deductions they claim with adequate supporting records. Sec. 6001; see also, e.g., Meneguzzo v. Commissioner, 43 T.C. 824, 831-32 (1965). If a taxpayer claims a business expense, but cannot fully substantiate it, we may approximate the allowable amount under certain circumstances. Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930). For this rule to apply, however, there must be some basis for the Court to make a reasonable estimate of the deductible amount based on the record. Vanicek v. Commissioner, 85 T.C. 731, 742-43 (1985). We need not apply the Cohan rule at all if the evidence presented by the taxpayer is insufficient to identify the nature of or estimate the extent of the expense. See, e.g., Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957) ("there [must] be sufficient evidence * * * that at least the amount allowed in the estimate was in fact spent or incurred for the stated purpose"). In addition, section 274(d) and its regulations supersede the Cohan

---

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

rule and lay out strict substantiation requirements for certain types of expenses.  See, e.g., <u>Sanford v. Commissioner</u>, 50 T.C. 823, 827-28 (1968), affd. 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

Section 6651(a)(1) imposes an addition to tax for failure to timely file a return unless the taxpayer shows that his failure was due to reasonable cause and not willful neglect.  Section 6662 provides for a penalty of 20 percent of the underpayment attributable to negligence, disregard of rules or regulations, or substantial understatement of income tax. "Negligence * * * includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly."  Sec. 1.6662-3(b)(1), Income Tax Regs.  The section 6662 penalty, however, is subject to a reasonable-cause-and-good-faith defense.

## I.  <u>Griffin's Evidence</u>

Griffin presented two types of evidence--documentary and testimonial.  Her documentary evidence consisted of the following:

- Summary of depreciation/section 179 expenses with illegible backup documents,

- summary of travel expenses,

- summary of car and truck expenses,

- summary of supply expenses,

- a letter from her church with a summary of contributions,

- documents about a casualty loss,

- a job order and other documents relating to licensing of someone she did business with,

- copies of credit-card statements, and

- incomplete copies of bank statements.

Griffin submitted all of her documentary evidence to the Commissioner less than 14 days before trial. And the evidence was filled with problems. It consisted mostly of summaries, many of which lacked receipts or other backup documentation. And the backup documentation that she did provide at the last minute--such as handwritten cash receipts with only her own signature, copies of receipts xerographically reduced to such a small size as to render them illegible, and credit-card statements with nothing to tie the expenses to her various businesses--lacked credibility. Such gaps in the documentary evidence can, however, be filled by testimony, and Griffin did try to fill in these gaps. But we found her testimony to be generally vague and evasive.

## II.  Griffin's Businesses

### A.  Delivery Service

| Delivery Service's Income as Reported on Schedule C | | | |
|---|---|---|---|
| Year | Gross Income | Net Income | Net Cash Income[1] |
| 2001 | $54,775 | $358 | $1,016 |
| 2002 | 78,691 | (4,447) | 48 |
| 2003 | 68,006 | (5,331) | 1,333 |

[1] Net cash income is equal to the net income plus the depreciation expense.

| Delivery Service's Expenses Disallowed by Commissioner | | | | | |
|---|---|---|---|---|---|
| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
| 2001 | $658 | --- | $25,074 | $6,992 | $8,678 |
| 2002 | 4,495 | --- | 31,343 | 7,181 | 24,775 |
| 2003 | 6,664 | --- | 29,179 | 1,375 | 24,964 |

We begin with Griffin's delivery business, for which she claims to have logged many miles delivering goods throughout the greater Los Angeles area.  She testified that she would purchase inventory, collect money from customers, and then profit on the difference--essentially acting as a middleman retailer.  There is insufficient evidence to understand the nature of her inventory:

> A significant portion of the delivery income was related to myself representing my business acting as a middle person for the purchase of other items.  So the gross income does not only include the cost of the delivery but for whatever items it was that were delivered.
>
> *       *       *       *       *       *       *
>
> The delivery was putting the goods in their hands[.]
>
> *       *       *       *       *       *       *

Usually we were a facilitator for people who needed to get a product that could not necessarily go acquire it themselves but they still needed it.

She said she remembers neither the number of customers she supplied with this unnamed merchandise, nor any of their names.

### B. Video Production

| Video Production's Income as Reported on Schedule C | | | |
|---|---|---|---|
| Year | Gross Income | Net Income | Net Cash Income |
| 2001 | $258,524 | ($34,251) | $369 |
| 2002 | 218,354 | (35,615) | (501) |
| 2003 | 153,337 | (20,725) | 11,182 |

| Video Production's Expenses Disallowed by Commissioner | | | | |
|---|---|---|---|---|
| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
| 2001 | $34,620 | $25,081 | $48,363 | $67,055 | $29,797 |
| 2002 | 35,114 | 27,589 | 38,443 | 39,300 | 24,979 |
| 2003 | 31,907 | 9,268 | 28,059 | 1,829 | 26,175 |

Griffin claims that her video-production business involved copying master tapes, editing, and providing graphics and other services to various customers. Once again, she couldn't remember how many customers she serviced annually; she thought it was somewhere between 100 and 1000.[4] And she had no retail location

---

[4] THE COURT: How many customers did you have for your video production business?

THE WITNESS: Once again, I don't know the answer to that from a customer standpoint. * * *

THE COURT: You're talking 1,000 customers?

(continued...)

for "solicitation and walk-in."  In her trial testimony, Griffin

explained that the content of the videos included such

traditional videographic jobs as weddings, but extended even to

stop-action animation:

> THE COURT:  People would come in and if they had some
> creative type make a video, live action short of the
> Smurfs or something and you--
>
> THE WITNESS:  Yeah.  We did duplications, editing,
> graphics.

She also allegedly brought her video-production skills to

the Southern California rave scene.  She said she set up video

screens for customers she termed "teenyboppers" at parties she

described as:

> [A]ll undercover and you can only find out by somebody
> actually giving you a handout * * * They do a lot of
> drinking, illegal drugs and things they probably
> wouldn't do in the presence of their parents * * *
> They're just going hook[5] wild and crazy is the bottom
> line.

---

    [4](...continued)

    THE WITNESS:  Not necessarily.  Not 1,000.  I can ballpark
you.  I'd say not 1,000.

    THE COURT:  How many?

    THE WITNESS:  I said not 1,000.

    THE COURT:  A hundred?

    THE WITNESS:  Definitely more than 100--jobs I've done.

    [5] This is either a transcription error of "hog wild" or "off
the hook" or a level of craziness with which the Court is
unfamiliar.

Griffin reported substantial depreciation for her video-production business each year.[6]  But her choice of suppliers was unorthodox.  One of her favorite suppliers, "VCR Gary,"[7] offered her the convenience of taking cash in increments of less than $10,000.

> THE WITNESS:  * * * [H]e would be the guy I'd be getting them from because he's the guy who could accept payment from me and things like that that would be more accommodating to me.
>
> THE COURT:  What do you mean "accept payment from you," because normally anybody would accept payment from you.
>
> THE WITNESS:  When I say "payments" I mean if a machine cost $18,000, he would take $9,000 now and $9,000 later.

C.  Janitorial Maintenance Service

| Janitorial Maintenance Service's Income as Reported on Schedule C | | | |
|---|---|---|---|
| Year | Gross Income | Net Income | Net Cash Income |
| 2001 | $126,357 | ($4,612) | $126 |
| 2002 | 146,986 | (6,685) | (670) |
| 2003 | 109,556 | (4,058) | 1,014 |

| Janitorial Maintenance Service's Expenses Disallowed by Commissioner |
|---|

---

[6] Some of the most expensive items Griffin was depreciating include:  two motor vehicles, eight different purchases of Microsoft Office, eight camcorders, twelve tripods, eight tripod head/adapter plates, three VCRs, eleven different machines for video editing, and nine LCD monitors.

[7]  An IRS agent credibly testified about his effort to contact VCR Gary to verify the claimed expenses by calling several different telephone numbers, all of which had been disconnected.  Griffin explained that VCR Gary "has passed away in the sense of the guy who's VCR Gary."

| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
|------|-----------|--------|----------|-------------|-----------|
| 2001 | $4,738 | $6,878 | $10,414 | $22,499 | $48,620 |
| 2002 | 6,015 | 8,919 | 13,289 | 28,124 | 49,060 |
| 2003 | 5,072 | 2,879 | 11,987 | 829 | 50,573 |

Griffin explained that her janitorial business focused on cleaning up after new home construction. She couldn't remember the names of any customers, how many homes her service cleaned, or how much time she spent on the business. She noted that her role was managerial and that she used day laborers instead of doing any of the work herself. We pointed out that she grossed over $109,000 in 2003 but had not claimed any wage expenses (and only $829 in commissions). She explained that people to whom she had lent money when they found themselves short of cash would work for her to pay down their debts. She did admit that, despite the very large number of delinquent loans she had, she had never deducted any bad-debt expenses. This is all the more remarkable in light of her testimony that she had loaned out between $100,000 and $200,000 during the years at issue--all with no records kept, no interest charged, and no knowledge of how the debtors would use the loan proceeds.

D.  Computer Repair Service

| Computer Repair Service's Income as Reported on Schedule C | | | |
|------|------|------|------|
| Year | Gross Income | Net Income | Net Cash Income |
| 2001 | $45,386 | ($1,994) | $32 |
| 2002 | 55,037 | (7,223) | (476) |

| 2003 | 43,918 | (7,034) | 1,759 |
|------|--------|---------|-------|

| Computer Repair Service's Expenses Disallowed by Commissioner | | | | | |
|------|------|------|------|------|------|
| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
| 2001 | $2,026 | $1,012 | $7,164 | $12,483 | $8,714 |
| 2002 | 6,747 | 2,312 | 8,955 | 15,605 | 12,007 |
| 2003 | 8,793 | 1,008 | 11,194 | 1,328 | 9,156 |

Griffin also claimed to have hired contractors to repair computers for what was--yet again--an unknown number of customers.[8] According to Griffin, most of these customers were individual consumers in need of simple repairs, such as hard-drive replacements or RAM upgrades. She also allegedly serviced small businesses with up to about 20 computers. She explained that the contractors would drive to the customer's home or business to perform the repairs. Griffin didn't advertise, claiming her customers came from word-of-mouth referrals. Much as she had in her janitorial business, she spent very little on labor costs in 2003 and grossed $43,918, all without doing any of the repair work herself.

> THE COURT: And commissions were only $1328. Was this, again, people that you had given money to who were paying it off in the form of services to you?
>
> THE WITNESS: Yes. I was doing a whole lot of work-offs.

---

[8] Griffin testified that she had "more than 100, but less than 1,000" computer-repair customers.

THE COURT:  And you were fortunate in having lent money to people who knew how to do computer repair?

THE WITNESS:  Most people know how to replace a hard drive or pull the RAM out. * * *

E.  Handyman Service

| Handyman Service's Income as Reported on Schedule C | | | |
|---|---|---|---|
| Year | Gross Income | Net Income | Net Cash Income |
| 2001 | $196,732 | ($2,883) | $695 |
| 2002 | 283,723 | (10,407) | (412) |
| 2003 | 157,418 | (10,974) | 2,619 |

| Handyman Service's Expenses Disallowed by Commissioner | | | | | |
|---|---|---|---|---|---|
| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
| 2001 | $3,578 | --- | $57,747 | $83,211 | $30,567 |
| 2002 | 9,995 | $1,349 | 86,444 | 97,974 | 62,975 |
| 2003 | 13,593 | 1,714 | 53,558 | 3,128 | 63,300 |

Griffin's next small business was a handyman service.  She ran it very similarly to the others, testifying that she farmed out different jobs to a variety of subcontractors.  She would occasionally do simple jobs herself like pouring a concrete driveway and testified that her personal specialty was electrical work.  She also said that she used day laborers for basic manual labor.  Griffin explained as well that her handyman business often took her to the border, where she personally picked up supplies.

THE COURT:  What was going on in San Diego for your handyman service?

THE WITNESS:  That's where the work was, so that's where we were going to to accomplish the task.

THE COURT:  Did you have a lot of shuttling back and forth from San Ysidro/San Diego area?

THE WITNESS:  Yes.  On most occasions, L.A. to San Diego was a daily trip.

THE COURT:  And the supplies that year are for nearly $54,000.

THE WITNESS:  That is a combination of either purchasing concrete or mix, lumber or buying baffles
* * *

As was true with her other businesses, the handyman service had negligible labor expenses and a complete absence of records.

F.  Landscape Maintenance Service

| Landscape Maintenance Service's Income as Reported on Schedule C | | | |
|---|---|---|---|
| Year | Gross Income | Net Income | Net Cash Income |
| 2001 | $89,801 | ($3,268) | $37 |
| 2002 | 112,041 | (4,879) | (571) |
| 2003 | 58,842 | (3,356) | 839 |

| Landscape Maintenance Service's Expenses Disallowed by Commissioner | | | | | |
|---|---|---|---|---|---|
| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
| 2001 | $3,305 | $2,796 | $2,631 | $46,893 | $20,037 |
| 2002 | 4,308 | 3,495 | 3,289 | 58,554 | 25,372 |
| 2003 | 4,195 | 1,819 | 7,111 | 989 | 21,647 |

Griffin also claimed that she hired day laborers for her landscaping business.  As with her janitorial and computer businesses, a very low labor expense ($989) generated extraordinary sales (almost $59,000 in 2003) in what is usually thought of as a labor-intensive enterprise.  And she couldn't

remember any of the business's customers because she did not perform the work. (She also had no explanation for why she had no memory of billing customers or soliciting their business.) In addition, she claimed that she kept her equipment in vans because her 800-square-foot warehouse couldn't hold all of it--especially when combined with the equipment for all her other businesses. The vans were parked in a vacant lot or on the street in South Central Los Angeles.

### G. Parking Lot Maintenance/Steam-Cleaning Service

| Parking Lot Maintenance/Steam-Cleaning Service's Income as Reported on Schedule C | | | |
|---|---|---|---|
| Year | Gross Income | Net Income | Net Cash Income |
| 2001 | $134,938 | ($8,718) | $88 |
| 2002 | 178,547 | (11,167) | 797 |
| 2003 | 167,118 | (8,154) | 2,039 |

| Parking Lot Maintenance/Steam-Cleaning Service's Expenses Disallowed by Commissioner | | | | | |
|---|---|---|---|---|---|
| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
| 2001 | $8,806 | $2,348 | $6,643 | $37,081 | $56,743 |
| 2002 | 11,964 | 2,935 | 8,304 | 46,361 | 82,538 |
| 2003 | 10,193 | 3,699 | 13,806 | 23,430 | 79,873 |

Griffin's workers--by her account, about 100 different laborers--swept parking lots and steamed sidewalks for somewhere between 100 and 1000 customers a year. She remembers almost none of the business's customers, but she did receive a 1099 from the Hollywood DMV. Her other customers were unspecified convenience stores, restaurants, and other establishments with dirty

sidewalks in "the Jungle." Her workers would spend about a half-hour steam cleaning each customer's sidewalks and were paid in cash. She said she didn't remember any of their names "off the top of my head." To get a better sense of the scope of this business, we asked whether the cleaning business included any laundering activities.

> THE COURT: So this was steam-cleaning. Did that include any sort of window-cleaning or laundering as well?

> THE WITNESS: Whenever you steam-clean sidewalks and there's windows near, you have to clean the windows because the overspray. You don't really have a choice.

H. Consulting Service

| Consulting Service's Income as Reported on Schedule C | | | |
| --- | --- | --- | --- |
| Year | Gross Income | Net Income | Net Cash Income |
| 2001 | $9,139 | ($1,901) | $16 |
| 2002 | 10,940 | (2,079) | 343 |
| 2002 | 7,798 | 371 | 1,662 |

| Consulting Service's Expenses Disallowed by Commissioner | | | | | |
| --- | --- | --- | --- | --- | --- |
| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
| 2001 | $1,917 | $733 | --- | $4,783 | --- |
| 2002 | 2,422 | 1,106 | --- | 4,912 | --- |
| 2003 | 1,291 | 853 | --- | 615 | --- |

Griffin's consulting business involved website design. She claimed she wouldn't develop an entire website from start to finish, but would design website features offline for later use by her clients. The income from this business was a lagniappe to

her other enterprises, since she admitted that she doesn't have any website-design expertise; as she put it: "I'm not a website designer, I'm not an HTML kind of person." She allegedly hired someone--whose name she can't remember--with the required expertise. Unlike her 100-to-1000-customer businesses, this business served only 10 to 20 customers annually, she said, but she still couldn't name anyone even from this putatively smaller customer base.

### I. Notary/Process Server Service

| Notary/Process Server Service's Income as Reported on Schedule C | | | |
|---|---|---|---|
| Year | Gross Income | Net Income | Net Cash Income |
| 2001 | $35,528 | ($8,477) | ($4) |
| 2002 | 43,202 | (10,970) | 307 |
| 2003 | 32,263 | (9,004) | 1,838 |

| Notary/Process Server Service's Expenses Disallowed by Commissioner | | | | | |
|---|---|---|---|---|---|
| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
| 2001 | $8,473 | --- | $3,222 | $6,879 | $10,143 |
| 2002 | 11,277 | --- | 2,727 | 7,125 | 9,839 |
| 2003 | 10,842 | --- | 3,335 | 1,520 | 9,882 |

Griffin's last business return was for a combination of notarial fees and process serving. Griffin admitted that she did not do the bulk of this work herself, again relying on "a lot" of people[9] for her notary and process server business. Her target customers were incarcerated. Since the amount she could charge

---

[9] An indeterminate number, according to her testimony, falling somewhere in the range of 100 to 1000.

as a notary was limited by law, she claims that most of the revenue came from "arrival fees" to go to the various correctional facilities to provide services to the inmates. Griffin testified that the business brought in about $30 to $40 for each complaint served. She said she found herself forced into this niche because she didn't have a physical retail location, though she did include herself on several web-based directories for process servers. We tried to figure out whether this might have been a home business:

> THE COURT: So this was done out of your home, in other words.

> THE WITNESS: I'm not going to say that but you can make that assessment because I try not to do business at home.

> THE COURT: Where do you do business out of?

> THE WITNESS: * * * [A] warehouse/storage facility. Not a specific office, but definitely where that kind of thing was done. Not in my home.

J. Total

| Total Income as Reported on All Schedules C | | | |
|---|---|---|---|
| Year | Gross Income | Net Income | Net Cash Income |
| 2001 | $951,180 | ($65,746) | $2,375 |
| 2002 | 1,127,521 | (93,472) | (1,135) |
| 2003 | 798,256 | (68,265) | 24,285 |
| Total | 2,876,957 | (227,483) | 25,525 |

| Total of All Expenses Disallowed by Commissioner | | | | | |
|---|---|---|---|---|---|
| Year | Depr./§179 | Travel | Supplies | Commissions | Car/Truck |
| 2001 | $68,121 | $38,848 | $161,258 | $287,876 | $213,299 |

| 2002 | 92,337 | 47,705 | 192,794[1] | 305,136 | 291,545 |
| 2003 | 92,550 | 21,240 | 158,229 | 35,043 | 285,570 |
| Total | 253,008 | 107,793 | 512,281 | 628,055 | 790,414 |

[1] The Commissioner's brief erroneously provides $195,794 as the total amount of deductions disallowed for supplies in 2002.

Over $2.8 million in cash flowed through Griffin's nine businesses over the course of three years.  If her returns are to be believed, these gross receipts were almost entirely offset with cash expenses, were never profitable, and apart from a single 1099, generated no records or identifiable customers.

The Commissioner also identified more problems with her returns, which we discuss next.

III.  Griffin's Returns and the Investigation

One problem was that Griffin had trouble filing her returns on time.  Her 2001 and 2002 returns were filed about two years late, but even her 2003 return was about a year late.[10]  The Commissioner selected Griffin's 2001-2003 returns for audit in 2005.  And here the Commissioner ran into a bigger problem-- something less than full cooperation during the audit.  Veronica Love, the revenue agent assigned to Griffin's case, tried to set up a meeting with Griffin on three different occasions, but Griffin never showed up.  Due to Griffin's failure to respond, Love summoned Griffin's bank records.  Despite her

---

[10] Griffin filed her 2001 return on March 12, 2004; her 2002 return on April 14, 2005; and her 2003 return on June 17, 2005.

noncooperation, the Commissioner allowed over $800,000 in Schedule C expenses,[11] but disallowed those we've already outlined in Section II.

The Commissioner also disallowed all of Griffin's Schedule A itemized deductions:

| Total Claimed/Disallowed Schedule A Deductions | | | |
|---|---|---|---|
| | 2001 | 2002 | 2003 |
| Medical | $14,653 | $13,113 | $12,267 |
| Taxes | 3,372 | 3,084 | 3,162 |
| Contributions | 16,672[1] | 16,206[2] | 1,017 |
| Casualty loss | --- | --- | 1,492 |
| Miscellaneous | 12,681 | 259 | 10,060 |
| Total | 30,706 | 16,456 | 27,998 |

[1]  Griffin's 2001 Schedule A lists $13,672 in gifts made in 2001 (line 15), and $9,732 in charitable gifts carried over from the prior year (line 17).  However, Griffin claimed zero in charitable gifts overall (line 18). Because the total deduction claimed on Griffin's 2001 Schedule A did not include any amount for charitable gifts, the $16,672 amount disallowed by the Commissioner was not included in the total amount of Schedule A deductions disallowed for 2001.

[2] The itemized deduction Griffin claimed for 2002 also did not include any amount for charitable gifts.  As such, this amount was not included in the total amount of Schedule A deductions disallowed for 2002.

In addition, the Commissioner disallowed a 2003 tuition-and-fees deduction of $2,387 for failure to substantiate, and asserted failure-to-file and accuracy-related penalties.

_____

[11] The Commissioner allowed the following Schedule C expenses in the original audit:  advertising, insurance, legal and professional, office expenses, rent-machinery, rent-other property, repairs, taxes/licenses, meals and entertainment, and utilities.  The record fails to reflect why.

Griffin timely petitioned the Tax Court, and trial was set for June 2008. Griffin asked for a continuance because she had failed to meet with IRS counsel for trial preparation and wanted another opportunity to get her records together. The case was continued and Love reached out to Griffin, trying to move things along. She tried calling the number Griffin provided--323-555-1212[12]--but when that failed she sent a letter via certified mail to Griffin's last known address. Griffin replied by fax, explaining she would be in Beijing for the Olympics and could not meet until the end of August. Love set up a meeting for late August, after the case had been set for trial on January 26, 2009--giving her "one last opportunity" to substantiate her deductions. Griffin showed up without any substantiating documentation, but got another chance to get her records in order by mid-September. At the September meeting, Griffin arrived with only a few documents, and they were disorganized. Once again, Love gave her another chance and scheduled a meeting for December 16. The morning of December 16 arrived, but Griffin did not. Griffin rescheduled for the following day, but again failed to appear. After three one-last-chance opportunities had passed, Love sent Griffin's file back to IRS counsel in December.

---

[12] Griffin had provided a working number, albeit the number for local telephone directory assistance in the 323 area code.

Love, IRS counsel, and Griffin did meet in January 2009 to prepare for trial. Griffin provided summaries of expenses without any backup documentation, which didn't satisfy the Commissioner. After calendar call, we held a chambers conference and ordered Griffin to organize her records and deliver them to the Los Angeles IRS office at 10 a.m., three days later. She couldn't make it. The IRS suggested faxing them in as she completed them.

The faxes started to come in throughout the day of January 29 and everything seemed legit, with summaries of expenses supported by photocopies of invoices. Love was about to allow the expenses until she attempted to verify an invoice from a firm named Office World with an L.A.-area address. Love looked up the company online and called its Oregon headquarters. Office World, it turned out, has no locations in greater Los Angeles. Then she faxed the invoice to the company to verify its authenticity-- Office World had not issued it.

The morning of the trial Love visited the address on the Office World invoice only to discover an apartment building. The Commissioner then reasonably declined to stipulate to the authenticity of any of Griffin's proffered documentary records of her businesses. (Though his agents apparently did not re-review any of the records that had already been accepted by the IRS as proof during the initial audit.) The Commissioner nevertheless

allowed some personal deductions when Griffin provided canceled checks.

| Allowed Schedule A Deductions | | | |
|---|---|---|---|
| | 2001 | 2002 | 2003 |
| Contributions | $8,827 | $2,680 | – |
| Taxes | 3,045 | 2,561 | $2,681 |
| Total | 11,872 | 5,241 | 2,681[1] |

[1] The total amount is less than the standard deduction. Therefore, for 2003 Griffin is entitled to the standard deduction.

We tried the case in Los Angeles, where Griffin more likely than not resided when she filed her petition. Griffin didn't bother to file a posttrial brief, despite our order to do so.[13]

## IV. Admissibility of Evidence

We consider what evidence to admit. The Commissioner argues that Griffin's evidence should be excluded because she failed to comply with the "14 Day Rule" and Federal Rule of Evidence 1006.

### A. The "14 Day Rule"

We issued our standing pretrial order which requires that any unstipulated documents be provided to the opposing party "at least 14 days before the first day of the trial session." Rule 131(b) provides that failure to comply with a standing pretrial

---

[13] We could dismiss Griffin's case or deem unopposed issues conceded because of her failure to file a brief and history of noncooperation. See Rule 123; Stringer v. Commissioner, 84 T.C. 693, 708 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986); Diesel Cnty. Truck Stop, Inc. v. Commissioner, T.C. Memo. 2000-317. Nevertheless, we'll evaluate her case on its merits to the extent we can.

order may subject a party to sanctions.  One such sanction, as laid out in the order, is the exclusion of evidence offered in violation of the 14-day rule.  See Kanofsky v. Commissioner, T.C. Memo. 2006-79, affd. 271 Fed. Appx. 146 (3d Cir. 2008).

Griffin didn't meet the 14-day deadline.  She was also on notice about the 14-day rule from an earlier trial session yet disregarded it a second time.  She offers no excuse, and we therefore exclude her last-minute evidence from our consideration because of her failure to comply with our pretrial order.

B.  FRE 1006

Most of Griffin's evidence was also mere summaries. Although Federal Rule of Evidence 1006 allows for the admissibility of this kind of evidence, the original source documents on which the summaries are based must be made available to the opposing party.  Griffin put together several summaries, but failed to provide the backup documentation to the Commissioner for review.  Therefore, the summaries presented at trial are also inadmissible under Federal Rule of Evidence 1006. See Rager v. Commissioner, 775 F.2d 1081, 1083 (9th Cir. 1985), affg. T.C. Memo. 1984-563; Kalgaard v. Commissioner, T.C. Memo. 1984-283 (excluding summaries of purported contributions because of the taxpayer's failure to provide original source documents), affd. 764 F.2d 1322 (9th Cir. 1985).

V.   Merits of Evidence

Out of an abundance of caution, we also consider the credibility of Griffin's evidence.

A.   Business Expenses

1.   Overview

Because the evidence Griffin provided lacks credibility, we will not use the Cohan rule in recalculating her deductions.  See Lerch v. Commissioner, 877 F.2d 624, 628-29 (7th Cir. 1989) (holding that there is no obligation to apply the Cohan rule where the taxpayer fails to cooperate with the Commissioner and the Tax Court), affg. T.C. Memo. 1987-295.  Moreover, Griffin provided no records that meet the substantiation requirements of section 274(d).[14]  Such requirements go to her claims for depreciation, car and truck, and travel expenses.  With these general thoughts in mind, we now look to each category of the disputed deductions.

---

[14] Under section 274(d), a deduction for traveling expenses, meals and entertainment, or listed property (as defined in section 280F(d)(4)) is disallowed unless the taxpayer properly substantiates:  "(1) The amount of such expense, (2) the time and place of the expense, (3) the business purpose, and (4) in the case of meals and entertainment, the business relationship between the taxpayer and the persons being entertained."  Fleming v. Commissioner, T.C. Memo. 2010-60 (citing section 274(d)).  Listed property includes:  automobiles and other transportation vehicles, property used for entertainment or recreational purposes, computers and computer equipment, and cellular telephones.  Sec. 280F(d)(4).

2.   Depreciation

Griffin claimed depreciation/section 179 expenses for a wide range of items[15] for which she provided a summary and backup documentation.  Her backup documentation included copies of receipts and invoices--reduced to four per page--that were often too small or too light to decipher.  Furthermore, some of the items could easily be for personal rather than business use.  And several items were subject to the substantiation requirements of section 274(d).[16]  For those purchases she did not provide sufficient proof of the amounts expended, the time and place of acquisition, or the business purpose.  See also sec. 1.274-5T(a), Temporary Income Tax Regs., supra.  Griffin is thus not entitled to the depreciation/section 179 expenses claimed.

3.   Travel and Car and Truck Expenses

Griffin provided bare-bones charts for travel and car and truck expenses.  Although the charts list the date, vendor, and amount spent for each purchase, there is no mention of the

---

[15] The following list provides some of the items Griffin was depreciating:  cellphones, notebook computers, design software, digital cameras, digital video cameras, projectors, brooms, dustpans, hoses, rakes, shovels, trash cans, cleaning supplies, vacuum cleaners, mops, ladders, vehicles, toolboxes, wheelbarrows, painting supplies, extension cords, lawnmowers, lawn edgers, cables, power supplies, tripods, camera batteries, chairs, a microwave oven, an encyclopedia set, a copier, televisions, data-recovery software, furniture dollies, and moving equipment.

[16] These items include vehicles, computers, and cellphones, to name a few.  See secs. 274(d), 280F(d)(4).

business purpose. Griffin thus failed to establish that such expenses were ordinary and necessary for her businesses as required by section 162, or even that they were business-related at all. See sec. 1.6001-1, Income Tax Regs. These expenses are also subject to the heightened substantiation requirements of section 274(d). The only documentary evidence that she provided was credit-card receipts that lacked sufficient detail, and could not be matched with the expenses she claimed as deductions. This documentation does not meet the requirements of section 274(d).

### 4. Supply Expenses

Griffin provided more charts in order to justify her supply expense deductions. The charts indicate the credit card used, date, vendor, and amount spent for each purchase. They do not have any information regarding what was purchased or how it was used. As we have already discussed, there is a serious question about the validity of the purported source documents. There is also no way to determine whether the supply expenses were previously accounted for in other Schedule C categories allowed by the Commissioner--such as office expenses or repairs. For example, the purchases from Office Depot could have been categorized as both supply and office expenses. The same problem presents itself when looking at the entries for Home Depot, where many of these purchases could be viewed as both repair and supply expenses. In addition, several of the purchases listed on the

chart could be construed as personal, such as an XM Radio subscription and the items from Target. The summary of supply expenses simply does not give enough information to determine the legitimacy of Griffin's supply-expense deductions, and her evasive testimony doesn't shed much light on the issue either.

### 5. Commission Expenses

Griffin claims to have incurred cash-commission expenses. But her vague testimony regarding such payments and her supporting documentation are not credible. She provided summaries at trial with over 800 handwritten "cash receipts" per year as backup documentation. Based on the receipts, she never paid the same person more than once. The payees never signed the receipts, and some of them had very unusual names.[17] Moreover, no contact information for any of the payees was provided. Even if we were to admit this evidence, we wouldn't believe it.

### B. Other Deductions

### 1. Church Contributions

Griffin provided contribution statements from her church for 2001, 2002, and 2003. If she had provided the statements

---

[17] In Griffin's records, for example, the name "Xander" appeared five times and "Zander" appeared six times. They were presumably different people because each Xander or Zander had a different surname. According to the Commissioner's investigation, there are very few Xanders or Zanders in the entire state of California--about 85 Xanders and 95 Zanders. Griffin either had an uncanny ability to find Xanders/Zanders, or her cash receipts are unreliable evidence. We do not believe the former possibility.

earlier, the Commissioner would have been able to examine them and possibly confirm their authenticity with the church. On their face, the statements do appear legitimate. But no canceled checks or other underlying validation of the statements were provided. We need not decide the credibility of the statements because Griffin didn't submit them until trial; their inadmissibility rests on other grounds as discussed above.

### 2. Casualty Loss

Griffin claims someone stole rented equipment out of her van. She submitted rental invoices from Home Depot to support her claim for a casualty loss. But the invoices are from 2002 and the loss was claimed on her 2003 return. In any event, she didn't submit the invoice until the day of trial, and it is therefore inadmissible.

### 3. Tuition and Fees

Griffin offered no substantiation for her tuition and fees deduction.

## VI. Additions to Tax and Penalties

### A. Failure to File

Griffin conceded she filed her 2001, 2002, and 2003 returns more than five months late. She didn't offer any evidence to invoke the reasonable cause exception. This addition to tax therefore applies for each year.

B.    Accuracy-Related Penalty

Griffin has not produced any evidence to establish why this penalty should not be imposed for each year.  Griffin's disregard for recordkeeping is apparent throughout the record.  She also reduced her income tax liability to zero through her invalid deductions.  Her understatement of income tax due clearly exceeded the greater of ten percent of the tax required to be shown on each return or $5,000.  See sec. 6662(d)(1)(A).  We therefore uphold the Commissioner's assertion of the section 6662(a) penalty for 2001, 2002, and 2003.

Decision will be entered under Rule 155.